FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE BRADLEY PHARMACEUTICALS, INC.<br>SECURITIES LITIGATION | : Hon. Faith S. Hochberg<br>:<br>: Civil No. 05-1219 (FSH)<br>:<br>: **OPINION** |

Date: March 23, 2006

**HOCHBERG, District Judge:**

This matter comes before the Court upon Defendants Bradley Pharmaceuticals, Inc. ("Bradley" or "the Company"), Daniel Glassman, Bradley Glassman, and Brent Lenczycki's (collectively the "Individual Defendants") Motion to Dismiss the Consolidated Amended Complaint pursuant to Fed. R. Civ. P. 9(b), 12(b)(6), and Section 21D of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court has reviewed the submissions of the parties and considers the motion on the papers pursuant to Fed. R. Civ. P. 78.

**I.      Background.**

Plaintiffs represent a class of purchasers of common stock of Bradley between October 28, 2004 and February 25, 2005 ("the Class Period"). Bradley is a publicly-traded pharmaceutical company that specializes in over-the-counter and prescription products in the dermatological, gastrointestinal and podiatric markets. Defendants are Bradley, its President and Chief Executive Officer, Daniel Glassman, its Senior Vice President, Bradley Glassman, and its Chief Financial Officer, Brent Lenczycki.

Plaintiffs' Amended Consolidated Complaint (the "Complaint") alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The Complaint alleges that the Defendants engineered a $1 million "sham" sale of Deconamine, a cold remedy, to artificially inflate Bradley's net income for the Third Quarter of 2004.  Plaintiffs claim that the Deconamine sale was a "sham" because "it was designed solely to boost Third Quarter financials without any expectation that the customer would actually keep the product."

The earnings resulting from the Deconamine sale were included in Bradley's Third Quarter Press Release issued on October 28, 2004 (the "October 28, 2004 Press Release").  The press release reported net sales of approximately $28.5 million (up 43% compared to the same period in 2003) and net income of $3.7 million (down 28% compared to the same period in 2003) for the three months ended September 30, 2004.  The press release stated that "[t]he increase in Net Sales were led by new product sales of FLORA-Q(TM), launched in First Quarter of 2004, of $61,000 and product sales growth from ANAMANTLE(R)HC of $2,708,000 and DECONAMINE(R) products of $1,264,000 ..."

On November 9, 2004, Bradley filed its quarterly Form 10-Q with the SEC, reaffirming the Company's previously announced financial results.  In it, Bradley stated that "[t]he increase in DECONAMINE® products was primarily due to an increase in wholesaler buying patterns."

On February 28, 2005 (the first trading day after February 25, 2005, which is the last day of the Class Period), Bradley issued a press release (the "February 28, 2005 Press Release") disclosing that Bradley was notified in December 2004 that the SEC was conducting "an

informal inquiry relating to the Company to determine whether there have been violations of the federal securities laws." The press release stated, in relevant part that "in connection with the inquiry, the SEC staff has requested that the Company provide it with certain information and documents including with respect to revenue recognition and capitalization of certain payments." The press release also quoted the SEC as stating that "the inquiry is confidential and non-public" and "should not be construed as an indication by the Commission or its staff that any violation of the federal securities laws has occurred, or as a reflection upon any person, entity, or security." Finally, the press release announced that "[i]n light of the ongoing SEC staff inquiry and separate counsel's review, the Company will not be releasing its 2004 earnings at this time, as originally anticipated." Immediately following this announcement, Bradley's stock price fell $3.50 per share, or 26.4%, declining from $13.25 to $9.75 per share.

On March 11, 2005, Bradley issued a press release to announce that Plaintiffs had filed the present class action, and that "[a]s a result of the lawsuits, SEC inquiry, Audit Committee review and associated expenses that are not currently estimatable" Bradley was "withdrawing its previously announced financial guidance for unreported periods."

In a press release dated April 27, 2005 (the "April 27, 2005 Press Release"), Bradley announced that it was restating the financial results for the Third Quarter of 2004 released on October 28, 2004 after its independent auditors "became aware of information indicating that a transaction recorded as a sale by the Company in the Quarter ended September 30, 2004 did not meet the criteria for revenue recognition in such period." The Company explained that "[t]he transaction consisted of a sale of approximately $1 million of Deconamine Syrup shipped and paid for in the third quarter" and that the auditors had concluded "that the sale did not meet the

criteria for revenue recognition after the customer expressed its intention to return the product and the sale was modified in that the Company would accept all unsold product as of February 1, 2005, with credit granted against other trade amounts owed by the customer." The new statements reduced the previously reported net sales for the Third Quarter of 2004 by $1,043,907 and the net income by $613,594. On April 27, 2005, the day of the announcement, Bradley's share price fell by $0.10, or 1%, closing at $8.95 per share. The following day, on April 28, 2005, the share price increased by $0.38, or 4.2%, closing at $9.33 per share.

This class action lawsuit was filed on March 2, 2005, and was consolidated with substantially identical suits subsequently brought by other plaintiffs on May 5, 2005. Plaintiffs filed their Consolidated Amended Complaint on June 20, 2005. Invoking the heightened pleading standards of both Fed. R. Civ. P. 9(b) and the PSLRA, Defendants have moved to dismiss the Consolidated Amended Complaint for failure to state a claim for a violation of Section 10(b) and Rule 10b-5.

## II.     Standard of Review.

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). While a court need not credit a complaint's "bald assertions" or "legal conclusions," it is required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Id.* (citing *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989)); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997). In evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court

may consider only the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the Plaintiff's claims are based on those documents. *Pension Guaranty Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1992).

### III.     Analysis.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under this statute by the SEC, makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact in order to make the statements made in light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The elements of a Section10(b)/Rule 10b-5 claim are:

(1) *a material misrepresentation (or omission)*; (2) *scienter, i.e.*, a wrongful state of mind; (3) *a connection with the purchase or sale of a security*; (4) *reliance*, often referred to in cases involving public securities market (fraud-on-the-market cases) as "transaction causation;"(5) *economic loss*; and (6) *"loss causation," i.e.*, a causal connection between the material misrepresentation and the loss.

*In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, *12 (3d Cir. 2006) (citing *Dura Pharm., Inc. v. Broudo*, 125 S.Ct. 1627, 1631 (2005)).

A complaint alleging violations of Section 10(b) and Rule 10b-5 must comply with the heightened pleading requirements of the PSLRA. Under the PSLRA, the complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed,"

15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). Failure to meet the PSLRA's pleading requirements will result in the dismissal of the complaint. *See* 15 U.S.C. § 78u-4(b)(3)(A) ("In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of [15 U.S.C. § 78u-4(b)(1)] and [15 U.S.C. § 78u-4(b)(2)] are not met.").

In addition to the PSLRA pleading requirements, a plaintiff alleging securities fraud must comply with Fed. R. Civ. P. 9(b). *See GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004). Fed. R. Civ. P. 9(b) requires plaintiffs to plead "the circumstances constituting fraud ... with particularity." Fed. R. Civ. P. 9(b). In the securities fraud context, this means that a plaintiff's allegations of misstatements must be supported with "all the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when and how of the events at issue." *In re Rockfeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted).

In the present case, Defendants argue that the Complaint should be dismissed because (1) Plaintiffs have not met their burden of adequately pleading loss causation as set forth by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*; and (2) the Complaint fails to allege sufficient facts supporting a strong inference of scienter.

### A. Loss Causation

In the context of 10b-5 claims, loss causation generally requires a plaintiff to allege sufficient facts to show that "the alleged misrepresentations proximately caused the decline in the security's value." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000); *see also* 15 U.S.C. § 78u-4(b)(4) (In any private action arising under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.")

The Supreme Court recently addressed the loss causation requirement in *Dura Pharmaceuticals, Inc. v. Broudo*. In *Dura*, the Court held that in fraud-on-the-market cases, alleging that a misrepresentation caused an inflated purchase price does not, by itself, suffice to plead loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S.Ct. 1627, 1631 (2005) ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."). Rejecting the Ninth Circuit's pleading standard for loss causation, the Court emphasized that the PSLRA "makes clear that Congress intended to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 1633. Mere allegations of purchase price inflation, standing alone, are insufficient to satisfy "the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* Such an approach, the Court observed, "would allow recovery where a misrepresentation leads to an inflated purchase price but nonetheless does not proximately cause any economic loss." *Id.* Because an "an initially inflated purchase price *might* mean a later loss," but not "inevitably so," the Court found that a complaint alleging nothing more than the

-7-

plaintiffs paid "artificially inflated prices" for certain securities and as result "suffered damages" failed to adequately allege loss causation under Section 10(b). *Id.* at 1632. To survive a motion to dismiss, securities fraud plaintiffs must plead "a causal connection between the material misrepresentation and the loss." *Id.* at 1631. The Court observed that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 1634.

Here, Plaintiffs allege that "[t]he false and misleading statements in the Third Quarter Press Release and later the Third Quarter 10-Q inflated Bradley's stock price by $3.50 per share, and that "Plaintiffs and the Class suffered actual economic loss and were damaged when the sham Deconamine transaction, which was concealed by defendants' misrepresentations and omissions was disclosed to the market causing inflation to be removed from Bradley's stock price." The Complaint states that "[o]n February 28, 2005 – the first day of trading after defendants announced the SEC investigation concerning the sham Deconamine transaction, Bradley's stock fell precipitously – more than 26% – as the prior artificial inflation came out of Bradley's stock price." According to the Complaint, "[t]he 26% decline in Bradley's stock price at the end of the Class Period was a direct result of the revelation to the market and investors of the nature and extent of the Deconamine transaction that had been concealed by defendants' prior misstatements and fraudulent conduct."

Defendants contend that "Plaintiffs here make the same type of allegations as those dismissed by the Supreme Court in *Dura*." Relying on *Dura* and several decisions issued in its wake, Defendants argue that *Dura* requires Plaintiffs to "allege a loss following the 'corrective disclosure' of the allegedly undisclosed misrepresentation." They maintain that Plaintiffs have

-8-

failed to adequately plead loss causation because "the alleged disclosure plaintiffs rely on – the February 28, 2005 statement concerning the informal SEC inquiry – did not "correct" the alleged misstatements concerning the Deconamine sale."  Defendants argue that the February 28, 2005 disclosure was not genuinely "corrective" because the February 28, 2005 Press Release (1) "said nothing about Deconamine;" (2) "is simply a disclosure of a non-specific SEC inquiry;" (3) "involved an unspecified request for information and documents, 'including with respect to revenue recognition and capitalization of certain payments;'" (4) "stated that the SEC's inquiry 'should not be construed as an indication ... that any violation ... has occurred.'"

The "true" corrective disclosure, Defendants argue, was not made until April 27, 2005, one month after the end of the Class Period, and "far from 'negatively affecting the value of the security'" "resulted in an increase of Bradley's share price, negating any causal link between the alleged misrepresentation and the plaintiffs' loss."

We disagree with Defendants' rigid and dogmatic interpretation of *Dura*.  In *Dura*, the Supreme Court only suggested that the plaintiffs needed to have alleged in some fashion that "the truth became known" before "the share price fell."  *Dura*, 125 S.Ct. at 1634.  However, *Dura* did not address what type of events or disclosures may reveal the truth.  *See id.* (finding that "the complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient.").  Nor did *Dura* explain how specific such disclosure must be.  *See In re Winstar Communications*, 2006 WL 473885 (S.D.N.Y. 2006) (stating that in *Dura*, "[t]he Court did not address the means by which the information is imparted to the public.  Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any

requirement that the disclosure take a particular form or be of a particular quality."); *see also Brumbaugh v. Wave Systems Corporation*, --- F.Supp.2d ----, 2006 WL 52751, at *10-11 (D. Mass. 2006) (finding loss causation adequately pled where the plaintiffs had alleged that the company's disclosure of an SEC investigation relating to Defendants' misleading statements had "shocked the market" and caused the stock price to drop); *see finally In re Worldcom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (to satisfy loss causation under *Dura*, plaintiff must "establish that his losses were attributable to *some form of revelation* to the market of the wrongfully concealed information") (emphasis added).

Guided by a pragmatic understanding of *Dura*, the Court concludes that Plaintiffs have adequately pled loss causation. The revelation of the "truth" about the Deconamine sale did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events. *See, e.g., Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, 2005 WL 1563206 (N.D.Ill. 2005) (crediting as "partial disclosures of prior misrepresentations and omissions" the company's issuance of a press release announcing a lawsuit, a SEC and a DOJ investigation against the defendants). The February 28, 2005 announcement partially disclosed what the alleged misrepresentations had concealed from the market and began to reveal to the market place what the April 27 Press Release later confirmed.

Our securities laws do not operate in a vacuum. Defendants' contention that the announcement of the SEC inquiry did not satisfy *Dura*'s "revelation of the truth" requirement fails to acknowledge the significance of the market reaction to the February 28, 2005 disclosure. On February 28, 2005, immediately after Bradley disclosed the news of the SEC investigation and announced that the Company would delay the release of its earnings for 2004, Bradley's

stock price dropped $3.50 per share, or 26.4%.  As the Complaint alleges, the number of Bradley shares traded on February 28 reached 2,709,200, reflecting an unusually high volume of trading activity.  In contrast, the April 27, 2005 announcement of earnings restatement was followed by a slight decrease in Bradley's stock price ($0.10 per share, or 1% of the stock's value); only 64,900 shares were traded on that day.  On April 28, 2005, the next trading day, the Company's common stock gained $0.38, or 4.2% to close at $9.33; the daily trading volume reached 304,900 shares.  A comparison of the price and trading volume reactions surrounding both the February 28 and the April 27 disclosures thus suggest that the market corrected the price of Bradley's stock price when the truth began to leak out on February 28, 2005 and that by the time Bradley announced its restatement of earnings in April 2005, the market had already incorporated that the previously released financial statements could not be relied upon.

As the Supreme Court noted in *Dura*, "pleading rules are not meant to impose a great burden upon a plaintiff."  *Dura*, 125 S.Ct. at 1634.  As Plaintiffs have alleged that the price of Bradley's stock dropped after the truth regarding Defendants' alleged misrepresentations became known, this Court finds that they have pled, at this stage of the litigation, sufficient facts to satisfy the loss causation requirement and to provide Defendants "with some indication of the loss and the causal connection that [they have] in mind."  *Id.*

### B.  Scienter

The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In the Third Circuit, a plaintiff may establish the strong inference of fraudulent intent either (a) "by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, *12 (3d Cir. 2006) (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

Here, Plaintiffs' theory of scienter only relies on allegations of recklessness and conscious misbehavior.  *See In re Alstom SA*, 406 F.Supp.2d 433, 446 (S.D.N.Y. 2005) ("Where plaintiffs fail to allege scienter through motive and opportunity, the securities fraud claim may still be sufficiently stated by allegations demonstrating strong circumstantial evidence of conscious misbehavior or recklessness") (internal citations omitted).  Recklessness involves "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 535 (3d Cir. 1999).  Conscious misbehavior refers to "intentional fraud or other deliberate illegal behavior."  *Id.*

Viewing the Complaint in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, as this Court must, we conclude that Plaintiffs have pled sufficient facts constituting strong circumstantial evidence that the Defendants knew or were reckless in not knowing that the statements they made in the Third Quarter Press Release and the

Third Quarter 10-Q were materially false and misleading. The Complaint describes the materials containing the allegedly false statements, quotes the statements, identifies the specific individuals who allegedly made the statements to the public, and specifies when the statements were made. Further, contrary to Defendants' assertion, the Complaint does not merely allege that the Individual Defendants have acted with scienter "by virtue of their positions" within Bradley; instead, Plaintiffs have specifically alleged that each of the Individual Defendants were directly involved in preparing, drafting, and issuing Bradley's quarterly financial statements reporting the Deconamine transaction and the resulting net income. The Complaint also alleges that (a) each of the Individual Defendants knew facts and had access to specific information suggesting that their public statements made in the October 28, 2004 Press Release and the Third Quarter 10-Q were not accurate; and that (b) while Deconamine was a "dormant product with limited sales," and "was not one of the products the Company had instructed its sales force to promote," the revenue generated by the Deconamine transaction inflated Bradley's reported net income for the Third Quarter of 2004 by more than 20%. Such allegations are sufficient to induce a strong inference that the Defendants either knew that the statements they made in the Third Quarter Press Release and the Third Quarter 10-Q were materially false and misleading or that at the very least, given the magnitude of the alleged misrepresentation, the risk of falsity was "so obvious that [they] must have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004) (citing *In re Advanta*, 180 F.3d at 535).

**IV. Conclusion.**

For the reasons stated above, the Court finds that Plaintiffs have alleged sufficient facts to state a claim under Section 10(b) and Section 20(a) of the Exchange Act.[1]  Defendants' Motion to Dismiss the Consolidated Amended Complaint is denied. An appropriate order will issue.


                                                                /s/ Faith S. Hochberg
                                                                **Hon. Faith S. Hochberg, U.S.D.J.**

---

[1] The Complaint also alleges that the Individual Defendants are liable as "control persons" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Section 20(a) imposes liability on "every person who directly or indirectly controls any person liable" under the Exchange Act. *Id.*  To state a claim under Section 20(a), plaintiffs must allege (1) a primary violation of the securities laws; (2) a control relationship between the defendant and the primary violator; and (3) scienter. *Poling v. K. Hovnanian Enterprises*, 99 F.Supp.2d 502, 514 (D.N.J. 2000) (citations omitted).  While "a defendant cannot be held liable as both a primary violator and a controlling person, such alternative theories are permissible at the pleadings stage." *In re Alstom SA*, 406 F.Supp.2d 433, 486 (S.D.N.Y. 2005) (citations omitted).  Here, because Plaintiffs have stated a claim for a primary violation under Section 10(b), and have alleged sufficient facts to establish a control relationship between Bradley and the Individual Defendants, the Court finds that Plaintiffs have also met their burden with respect to Section 20(a).