UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

***ELECTRONICALLY FILED***

|  |  |
|---|---|
| ) | |
| IN RE BRADLEY PHARMACEUTICALS, INC. ) | Civil Action No. 05-CV-1219 |
| SECURITIES LITIGATION ) | (PGS) (ES) |
| ) | |

### DECLARATION OF JILL S. ABRAMS IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, CERTIFICATION OF CLASS FOR SETTLEMENT PURPOSES, PLAINTIFFS' COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND LEAD PLAINTIFFS' REQUEST FOR REIMBURSEMENT OF THEIR REASONABLE COSTS AND EXPENSES

I, JILL S. ABRAMS, hereby declare, under penalty of perjury, as follows:

1.    I am a member of the law firm of Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier"), Court-appointed Lead Counsel and counsel for Lead Plaintiff Chicago Transit Authority Retirement Fund for employees ("CTA") and the other Court-appointed Lead Plaintiffs (sometimes collectively referred to herein as "Lead Plaintiffs"). I submit this declaration in support of the final approval of the proposed Settlement of the above-captioned litigation, certification of the Class for Settlement Purposes, the application by Plaintiffs' Counsel for an award of attorneys' fees and reimbursement of expenses, and an award to Lead Plaintiffs CTA and Edward T. Greene ("Greene") for reimbursement of their reasonable costs and expenses directly relating to their representation of the class. My firm has directly participated in and/or overseen all aspects of this litigation, and I am fully familiar with the facts and circumstances herein.

2.    This securities class action was brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j (b) and 77t (a), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. It was instituted on behalf of purchasers of Bradley common stock during the period from October 28, 2004 (the date of Bradley's press release for the quarter ended September 30, 2004 ("2004 Third Quarter") through February 25, 2005 (the last day of trading before Bradley announced an inquiry by the SEC into revenue recognition issues (the "SEC Inquiry") at the Company. Lead Plaintiffs' claims focus on an alleged $1 million "sham" transaction (the "Deconamine Transaction") which they contend was designed by Defendants to artificially inflate Bradley's financial results for the 2004 Third Quarter. As a result of the Deconamine Transaction, Bradley's net income for the 2004 Third Quarter was improperly boosted by 20%, or $613,594.00. The Company's accountant's subsequent determination that the Deconamine Transaction did not comply with required revenue recognition criteria led to a restatement of Bradley's 2004 Third Quarter financial statements, and caused Bradley to delay the filing of its Form 10-K for the year ended December 31, 2004.

3.    This case presented challenges from its inception because, *inter alia*, it raised novel issues with respect to the issue of loss causation. For example, in their July 2005 motion to dismiss, Defendants argued that Lead Plaintiffs had not alleged loss causation in accordance with the then-recent opinion of the United States Supreme Court, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which was decided on April 19, 2005. While Judge Hochberg denied their motion to dismiss, Defendants presented strong arguments to support their position that Plaintiffs would be unable to prove loss causation at trial or to convince a jury of Defendants' scienter. These issues are discussed more fully below and in our accompanying memorandum of law.

2

**THE SETTLEMENT AND THE NOTICE SATISFY ALL REQUIREMENTS**

4.    In settlement of all claims in the litigation, Defendants agreed to pay $3,500,000 in cash, plus interest from the date of preliminary approval of this proposed settlement.[1] The entire settlement amount (after deduction of Court-approved costs and fees) will be distributed to Class members who timely submit valid Proofs of Claim.

5.    Pursuant to the Settlement, Class members will release any and all claims, rights, demands, causes of actions, suits, matters, and issues, whether known or unknown (including Unknown Claims as defined in the Stipulation) and whether based on federal, state, local, statutory or common law or any other law, rule or regulation that have been or could have been asserted at any time against any of the Released Parties by any member of the Class in the Action or in any court of competent jurisdiction, which arise out of or relate in any way to any of the allegations, transactions, facts, occurrences, matters, representations or omissions involved, set forth, or referred to in the Complaint with respect to the purchases or sales of Bradley securities during the Class Period. Stipulation, ¶¶ 1(v); 1(z).

6.    As stated in the accompanying Affidavit of Michael Rosenbaum, Managing Director of Berdon Claims Administration LLC ("Berdon" or the "Claims Administrator"), pursuant to the Preliminary Approval Order entered by this Court on February 19, 2009, the Claims Administrator mailed copies of the Notice of Pendency of Class Action Settlement, Motion for Attorneys' Fees and Expenses, and Lead Plaintiffs' Costs and Expenses and Settlement Fairness Hearing (the "Notice") and Proof of Claim and Release forms, by first class mail, to: Class members identified by Bradley's transfer records; brokers, banks and other

---

[1]    As provided in paragraph 3(b) of the Stipulation and Agreement of Settlement ("Stipulation"), the $3.5 million was deposited in an interest bearing escrow account by Lead Counsel.

nominees on the Depository Trust Company's Participant Proxy Contact List; specific research and/or compliance personnel of said brokers, banks and other nominees identified from databases created and maintained by Berdon who may have purchased Bradley common stock for the beneficial interest of individual investors; and to financial institutions identified by Vickers Directory of Institutional Investors as having directly purchased Bradley common stock during the Class Period. Rosenbaum Aff. ¶3. A total of 7,890 Notices were mailed to potential Class members by the claims administrator. Rosenbaum Aff. ¶6.

7.    As provided in the Preliminary Approval Order, the Summary Notice of Settlement (the "Summary Notice") was published in the March 16, 2009 edition of *Investor's Business Daily*. Rosenbaum. Aff. ¶9.

8.    In addition, Berdon has maintained a toll-free "800" telephone number (identified in paragraphs 19 and 60 of the Notice) to field calls from Class members, and has posted the Notice and Proof of Claim form on its website for direct access by Class members. Rosenbaum Aff. ¶4.

9.    The Notice and Summary Notice advised Class members of the May 20, 2009 deadline to object to the proposed Settlement or Plan of Allocation or exclude themselves from the Class, the application for an award of attorneys' fees and reimbursement of expenses, and the application for an award to Lead Plaintiffs CTA and Greene for reimbursement of their reasonable costs and expenses. On April 20, 2009, with the Court's permission, the Claims Administrator mailed, to all Class members who received the Notice, a Supplemental Notice that corrected a typographical error in the Notice with respect to the amount of counsel fees sought by Plaintiffs and notified Class members that the location of the Settlement Hearing was changed because the Court moved from Newark to Trenton. Rosenbaum Aff. ¶8.

10. The Notice provided a detailed description of the litigation, the claims being released, the reasons for the Settlement and an explanation of the Plan of Allocation, and was thus sufficient under the requirements of the PSLRA.

11. Plaintiffs' counsel respectfully submits that the notice program effectuated per the Preliminary Approval Order meets the due process requirements of Rule 23 of the Federal Rules of Civil Procedure which calls for the "best notice practicable under the circumstances."

12. The Notice, Summary Notice and Supplemental Notice provided Class members with notice of whose rights would be affected by the Settlement, the value of the Settlement and how to object to or exclude oneself from the Settlement, but no Class member has objected to any aspect of the Settlement or application for fees and expenses or sought exclusion from the Settlement. Rosenbaum Aff. ¶10. Thus, it is clear that the members of the Class share the view that the Settlement is a good one.

13. It is equally clear that, measured by all of the criteria for approval of class action settlements, the Settlement readily satisfies the relevant legal standards and should be approved by the Court as fair, reasonable and adequate. The Settlement is supported by the Lead Plaintiffs who were fully informed of all aspects of the litigation and the Settlement and counsel experienced and skilled in this type of complex litigation, who reached this agreement through extensive arms' length negotiations.

14. For the foregoing reasons, and as more fully set below and in the accompanying memorandum of law, it is respectfully requested that the Court: (a) certify the Class for the purpose of the Settlement; (b) approve the Settlement as fair, reasonable, and adequate; (c) approve the Plan of Allocation; (d) award attorneys' fees of 30% of the Settlement to Plaintiffs' Counsel for their efforts on behalf of the Class, and (e) reimburse Plaintiffs' Counsel and Lead

Plaintiffs CTA and Edward T. Greene for their reasonable costs and expenses incurred in connection with this litigation.

## FACTUAL BACKGROUND

15.   The following is a summary of the nature of the claims, the principal events that occurred during the course of the litigation, and the legal services provided by Plaintiffs' Counsel.

**The Parties**

16.   Lead Plaintiffs each purchased Bradley common stock during the Class Period.

17.   Defendant Bradley was located in West Fairfield, New Jersey and its common stock was traded on the New York Stock Exchange ("NYSE") during the Class Period.   On February 21, 2008, Bradley was acquired by Nycomed U.S., Inc. ("Nycomed").   Bradley's stock is no longer publicly traded.

18.   During the Class Period, Defendant Daniel Glassman was Bradley's Chairman of the Board, President and Chief Executive Officer. The Company was named after his son, Defendant Bradley Glassman, who was the Company's Senior Vice President, Sales and Marketing, and the de facto head of Bradley's Kenwood subsidiary.   Kenwood was one of two Bradley subsidiaries, and sold the two products at issue in this action, Deconamine and AnaMantle.   Defendant R. Brent Lenczycki was the Company's Vice President and Chief Financial Officer from 2001 until the Company was acquired by Nycomed.

**Bradley's Business**

19.   Unlike major pharmaceutical companies that focus on the research and development and eventual marketing of proprietary blockbuster drugs, Bradley was a niche pharmaceutical company that specialized in smaller products.   Whereas the blockbuster drugs

developed through the research and development by major pharmaceutical companies justify the time and cost of achieving patent protection, Bradley's specialty products did not rely on patented technologies. As a result, once Bradley was able to establish a market for a particular product, competitors offering less expensive comparable generic products moved in and eliminated Bradley's market share. After manufacturers announced the arrival of generic products, demand for the Bradley product would plummet and not recover.

**Defendants' False and Misleading Statements**

20.   Lead Plaintiffs alleged that Defendants engineered a $1 million sham sale of Deconamine Syrup to falsely inflate the Company's net income for the 2004 Third Quarter. Deconamine was a high margin product so that a $1 million sale could generate net income of over $600,000. However, Deconamine was a largely dormant product with limited sales, and was not one of the products the Company had instructed its sales force to promote. In their Consolidated Class Action Complaint ("Complaint"), Plaintiffs alleged that the Deconamine sale was designed solely to boost the 2004 Third Quarter financial statements, that it failed to comply with the Company's revenue recognition policies, and that Defendants had no expectation that the customer would actually keep the product. The Deconamine that was purportedly "sold" was quickly returned by the customer and credited to other amounts the customer legitimately owed to Bradley.

21.   Plaintiffs contended that Bradley's 2004 Third Quarter press release (issued on October 28, 2004, the "Third Quarter Press Release") and Third Quarter Form 10-Q for the quarter ended September 30, 2004 (filed with the SEC on November 9, 2004) were materially false and misleading because Bradley's $3,661,383 in reported net income was overstated by over $600,000, or 20%, as a result of the Deconamine Transaction.

**The SEC Inquiry and Subsequent Disclosure of the Restatement**

22.    In December 2004, Bradley was notified by the SEC that it was conducting an informal inquiry "to determine whether there have been violations of the federal securities laws" and had requested documents and information "with respect to revenue recognition," among other things.

23.    Bradley did not publicly disclose the SEC inquiry at the time.    Lead Plaintiffs contended that instead, Defendants sought to condition the market to lower financial results, including lower sales of AnaMantle (one of Bradley's best-selling products) via a January 12, 2005 press release which announced lowered guidance for 2005 estimated net sales and earnings per share.  The press release stated that:

> The Management Team now estimates Net Sales of $173 million and Earnings Per Diluted Share of $1.63 for 2005, as opposed to prior guidance of Net Sales of $190 million and Earnings Per Diluted Share of $1.90 for the year. *This adjusted guidance is the result of faster than expected market erosion of AnaMantle HC® hemorrhoid therapy due to recently introduced comparable products* and earlier than anticipated competition for KERALAC™ Nail Gel and KERALAC™ Lotion. (Emphasis added.)

24.    Bradley revealed the SEC inquiry prior to the opening of trading on February 28, 2005, after the SEC sent a second letter to Bradley regarding the inquiry.  Bradley also disclosed that it would not be announcing its 2004 earnings as previously planned.

25.    On February 28, 2005, Bradley's stock price fell $3.50 per share, or 26.4% from its prior trading day, to close at $9.75 per share on unusually high trading volume.

26.    On March 11, 2005, Bradley issued a press release and announced that it was "withdrawing its previously announced financial guidance."

27.    On April 27, 2005, Bradley issued a press release which stated that the Company had been formally notified by its outside auditor, Grant Thornton LLP, that the Deconamine

Transaction "did not meet the criteria for revenue recognition" and that the financial statements announced in the Third Quarter Press Release and reflected in Bradley's Third Quarter 10-Q would have to be restated to unwind it:

> As a result of the non-recognition of revenue in the third quarter from this sale, *the Company's consolidated statement of income for the third quarter of 2004 will need to be adjusted and restated to reduce net sales by $1,043,907 to $27,452,698, net income by $613,594 to $3,047,789, and diluted net income per common share by $0.03 to $0.18* and the Company's consolidated balance sheet as of September 30, 2004 will need to be adjusted and restated to record $1,043,907 of deferred revenue. The Company does not anticipate filing an amended Quarterly Report on Form 10-Q for the third quarter ended September 30, 2004 containing restated financial statements until completion of the audit of the Company's financial statements for the year ended December 31, 2004. Until such filing, *investors should not rely upon the financial statements included in the Company's Form 10-Q for the third quarter currently on file with the Securities and Exchange Commission.* (Emphasis added.)

## PROCEDURAL HISTORY

### Consolidation and Appointment of Lead Plaintiffs, Lead Counsel and Liaison Counsel

28.    Thirteen securities class actions were filed against the Individual Defendants and Bradley following Bradley's February 28, 2005 disclosure that the SEC was conducting an informal inquiry into Bradley and had requested documents with respect to "revenue recognition and the capitalization of certain payments."

29.    On May 6, 2005, the Court consolidated the actions filed against Bradley. On May 27, 2005, United States Magistrate Judge Patty Schwartz appointed the Chicago Transit Authority/Greene Group (comprised of CTA, American Welding Co., Inc. c/o Eric R. Greene, Edward T. Greene and Gonzalo M. Podesta) as Lead Plaintiffs, and on June 7, 2005, she appointed Abbey Spanier Rodd & Abrams, LLP as Plaintiffs' Lead Counsel, and Kantrowitz Goldhamer & Graifman as Plaintiffs' Liaison Counsel.

**The Motion to Dismiss**

30. On June 20, 2005, Lead Plaintiffs filed their Consolidated Class Action Complaint and Jury Trial Demand (the "Complaint"). Defendants moved to dismiss the Complaint on July 20, 2005 and argued that Lead Plaintiffs had failed to allege scienter, and, relying on the then-recent Supreme Court decision concerning loss causation, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 536 (2005), that Lead Plaintiffs had not adequately alleged loss causation.

31. Only a few courts had addressed loss causation between *Dura*, which was decided on April 19, 2005, and the August 22, 2005 due date for Lead Plaintiffs' opposition to the motion to dismiss. The parties each seized on this paucity of case law in an attempt to persuade the Court of the merit of their positions. The early interpretations of *Dura* contemplated how, if at all, *Dura* had changed the loss causation requirements at the motion to dismiss stage. Defendants relied heavily on *Liu v. Credit Suisse First Boston Corp.*, 399 F. Supp. 2d 298, 301 (S.D.N.Y. 2005) in which the court stated that "*Dura* did not establish what *would* be a sufficient loss causation pleading standard; it merely established what was *not*." (emphasis in original). The *Liu* court held that the plaintiffs had failed to plead loss causation because there was no allegation that the scheme alleged—purposeful understatement of earnings estimates that then caused the share price of certain companies to increase after an initial public offering—was ever disclosed to the market. *Id.* at 267. Rather, the only purported "corrective disclosure" came when the subject companies reported their earnings or when analysts downgraded their estimates of the companies. The court found that these purported corrective disclosures were nothing more than normal corporate events that would predictably cause share prices to drop. In this District, Judge Wolfson held that the plaintiffs in a securities fraud class action had failed to allege loss causation under *Dura* because the complaint failed to allege that the drop in stock price was

10

attributable to the defendants' misrepresentations, as opposed to a trend of stock price drops across all sectors of the U.S. economy and in the telecommunications industry in which the subject company was engaged. *In re Tellium, Inc. Sec. Litig.*, No. 02-cv-5889 (FLW), 2005 U.S. Dist. LEXIS 19467, at *84 (D.N.J. June 30, 2005).

32.    After full briefing on the motion, and after receiving Lead Plaintiffs' Notice of Supplemental Authority, United States District Judge Faith S. Hochberg denied Defendants' motion in a decision dated March 23, 2006. *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822 (D.N.J. 2006). Defendants filed their Answer to the Complaint on May 31, 2006.

**Discovery**

33.    On June 27, 2006, the parties participated in a Rule 16 discovery conference with Magistrate Judge Patty Shwartz, and she entered a scheduling order on June 28, 2006.

34.    On July 14, 2006, Plaintiffs' counsel served Plaintiffs' First Request for the Production of Documents and First Set of Interrogatories upon Defendants. Although Magistrate Judge Shwartz's June 28, 2006 scheduling order required Defendants to complete production of documents by September 12, 2006, Defendants failed to do so. Due to the January 19, 2007 discovery cut-off date in the existing pre-trial order, Plaintiffs' counsel moved swiftly to seek a resolution to this issue, and opposed the November document production date proposed by Defendants.

35.    After unsuccessfully proposing a joint letter to the Court regarding the discovery dispute, Plaintiffs' counsel sought the assistance of Magistrate Judge Ronald J. Hedges, to whom the case was assigned on July 11, 2006. Before Magistrate Judge Hedges heard the matter, Defendants began the production of documents. Defendants produced over 190,000 pages of documents.

36.    During the period between October and November, 2006, the parties discussed the discovery schedule with Plaintiffs urging greater speed and Defendants resisting that pace. Ultimately, the parties agreed on a revised scheduling order which was presented to the Court and So Ordered by Magistrate Judge Hedges on November 13, 2006.

37.    Plaintiffs' counsel undertook an exhaustive analysis of the documents produced by Defendants which included minutes of Bradley's Board of Directors meetings and several committees thereof; documents concerning the Deconamine Transaction and documents concerning sales data and projected sales data for Bradley products, communications with customers by Bradley's sales team, Bradley's internal investigation of the Deconamine Transaction, the SEC Inquiry, including the document requests made to Bradley by the SEC and documents produced to the SEC by Bradley as part of the SEC Inquiry.

38.    Once document review began, Plaintiffs were able to better distill the facts and focus on certain key issues. They served their Second Set of Interrogatories on December 15, 2006 with the goal of fine-tuning the discovery of those issues, and served a Second Request for Production of Documents on January 12, 2007.

39.    Throughout the fall of 2006 and into early 2007, Plaintiffs' counsel issued subpoenas to eleven third parties, and obtained documents from seven of them.[2]  Plaintiffs' counsel issued subpoenas to Grant Thornton, LLP, Bradley's outside auditor; Eisner LLP, Bradley's internal controls consultant; Quality King, the counterparty to the Deconamine Transaction; several research analysts who followed Bradley during the Class Period; two of

---

[2]    Plaintiffs' counsel did not obtain documents from three of the third parties with whom they had negotiated to obtain documents (Cardinal Health, McKesson Corporation and NDC Health Corporation) because the Parties agreed to an informal stay of the case before those parties produced documents. The SEC refused to provide documents concerning the Deconamine Transaction because its inquiry had not been terminated.

Bradley's customers; an information technology company that monitors and reports on prescription drug sales; and the United States Securities and Exchange Commission.

40. The documents received from Grant Thornton, LLP were instrumental in facilitating Plaintiffs' counsel's understanding of the events occurring before and after the Deconamine Transaction, as well as the investigations that took place concerning Bradley's accounting practices. The documents produced by Grant Thornton included documents concerning the SEC Inquiry, Grant Thornton's internal memoranda concerning its own investigation into the Deconamine Transaction, and documents concerning discussions with, and conclusions of, Cadwalader, Wickersham & Taft, LLP and O'Melveny & Myers, LLP, two law firms that were retained in February 2005 to conduct an internal investigation into the Deconamine Transaction, and several other issues raised in the SEC inquiry.

41. The documents received in response to Plaintiffs' subpoena served on Quality King, the counterparty to the Deconamine transaction, were instructive in determining the course of events leading up to and following the Deconamine Transaction. They identified the persons involved from Bradley and Quality King, and how the transaction was structured.

42. Plaintiffs' counsel served a subpoena on Eisner, LLP, Bradley's internal controls consultant. Eisner produced over 10,000 pages of documents that detailed Eisner's reviews of Bradley's internal controls both before and after the Deconamine Transaction.

43. Plaintiffs' counsel also served subpoenas on numerous research analysts who followed Bradley, including Banc of America Securities LLC, Raymond James & Associates, Inc., RBC Capital Markets, and Wachovia Securities, for the purpose of supporting the elements of materiality, reliance (via fraud on the market), loss causation and damages. Securities

analysts offer a key perspective about the perceptions and beliefs of the market with respect to information provided by and about a public company.

44.    The discovery obtained from Defendants and the third parties enabled Plaintiffs' counsel to assess the strengths and weaknesses of the case, and to sufficiently inform themselves of the facts necessary to evaluate the settlement prospects.

45.    For example, Plaintiffs' counsel's investigation confirmed that the Deconamine Transaction was improperly recorded as revenue in Bradley's financial statements. This belief was supported by the determinations of Bradley's own Audit Committee and Grant Thornton that the Deconamine Transaction was not recognizable as revenue under generally accepted accounting principles ("GAAP") mainly because of its conditional nature. Moreover, Eisner LLP opined that the Deconamine Transaction resulted from a material weakness in Bradley's internal controls.

46.    While the discovery obtained from Defendants and third parties indicated that the Deconamine Transaction was not supportable under GAAP, Plaintiffs' counsel believed that proving scienter in connection with the Deconamine Transaction would nonetheless entail significant risks. For example, in the face of the revenue recognition issue raised by the Deconamine Transaction, Grant Thornton reviewed Bradley's financial records for other revenue recognition improprieties, but found no others that failed to satisfy GAAP. In addition, discovery revealed that Grant Thornton expressed its view that the Deconamine Transaction was not the result of fraud. On this basis, a jury might have been persuaded that there was no intention by Defendants to commit wrongdoing. Plaintiffs' counsel believe that proving that a defendant purposely engaged in a wrongful act has significant impact on a jury and, while Plaintiffs' counsel may have discounted the accountant's legal conclusion, the effect on a jury

was a serious consideration. The documents and depositions of Bradley's senior officers provided a colorable argument that Bradley Glassman, who was responsible for the Deconamine Transaction, and Daniel Glassman, who approved it, did not understand the accounting significance of their customer's ability to return the Deconamine syrup and that Defendant Lenczyki was unaware of the side agreement that indicated the conditional nature of the Deconamine sale. It was Defendants' contention that the Deconamine sale to Quality King was based on what Defendants believed the demand for the product to be.

47.    Against this backdrop, Defendants steadfastly maintained that Lead Plaintiffs would not prove scienter at trial. Although Judge Hochberg had rejected Defendants' scienter argument at the motion to dismiss stage, there could be no certainty that this Court on summary judgment, or a jury at trial, would find that Lead Plaintiffs had adequately proven scienter.

48.    Lead Plaintiffs also recognized that they faced a challenge with respect to loss causation. Defendants took the position that Plaintiffs could not satisfy the *Dura* requirement that a defendant's misrepresentation proximately caused the plaintiff's economic loss. Defendants said that the announcement of the SEC's investigation into revenue recognition, which was followed by a 20% drop in Bradley's stock price, was not sufficiently direct to constitute a revelation of the wrong-doing here – the Deconamine Transaction. It was their position that the mention of a SEC inquiry caused the decline. Defendants argued that there was no "corrective disclosure" because the February 28, 2005 disclosure did not specifically mention Deconamine and "simply announce[d] a non-specific SEC inquiry." This would have been a hotly contested issue, both on summary judgment and at trial, each of which would undoubtedly turn into a battle of experts. Defendants argued that the April 27, 2005 announcement that the 2004 Third Quarter results were being restated because of the Deconamine Transaction was the

true "corrective disclosure," after which Bradley's stock price increased slightly. Thus Defendants argued, the drop in Bradley's stock price could not, as a matter of law, be attributed to the February 28, announcement of the SEC inquiry and further, there was no loss because the April 27 announcement concerning the Deconamine Transaction – upon which the Complaint focused – caused Bradley's share price to rise.

**Motion for Class Certification and Discovery of Lead Plaintiffs**

49.    On July 21, 2006, Defendants served their document requests on Lead Plaintiffs. Lead Plaintiffs served their written responses and objections and produced documents on a rolling basis thereafter. The production of documents by CTA was, as the affidavit of John V. Kallianis submitted herewith explains, not a simple task. CTA is responsible for overseeing the investment of its employees' funds and makes such investments through investment advisors. The advisors (who assist CTA in the selection of investment managers who actually make the investment decisions) provide periodic reports about the status of CTA's investments which are supported by underlying analysis, technical data and trading records. Lead counsel worked with CTA and its investment advisors to procure the relevant data about the advisor, general investment strategy, the Bradley investment, and to provide all relevant documents which reflected CTA's analysis, review and the related procedures regarding its investments. On December 15, 2006, Defendants served interrogatories upon Lead Plaintiffs, to which Lead Plaintiffs objected and responded on January 12, 2007.

50.    Lead Plaintiffs filed their motion for class certification on January 15, 2007, on behalf of a class consisting of all persons who purchased or otherwise acquired the common stock of Bradley between October 28, 2004 and February 25, 2005, inclusive (the "Class

Period").[3]  Lead Plaintiffs proposed Lead Plaintiffs CTA and Mr. Greene as class representatives.

51.  The parties subsequently conducted class certification related discovery, including the depositions of Lead Plaintiffs Edward T. Greene on February 22, 2007 and John Kallianis, Executive Director of the CTA, on March 2, 2007.

52.  On March 5, 2007, Magistrate Judge Ronald J. Hedges held a settlement conference, attended by the parties, but the parties were unable to make progress given their very different views of the strengths and weaknesses of the case.

53.  On April 2, 2007, Defendants filed their opposition to Lead Plaintiffs' motion for class certification.  Defendants argued that neither CTA nor Edward Greene could be certified as class representatives and that the case could not otherwise proceed as a class action. While Plaintiffs believed that the case would ultimately be granted class action status, they could not ignore that there were obstacles to certification.

54.  Plaintiffs' counsel immediately began drafting their reply.   However, before Lead Plaintiffs filed their reply, the parties agreed to stay of case in order to engage in mediation.

**Mediation**

55.  Following Magistrate Judge Salas' (before whom the case was then pending) scheduling of a settlement conference in the spring 2007, the parties discussed the possibility of settlement and agreed to engage in mediation.  They entered into an April 20, 2007 Joint Stipulation and Scheduling Order which provided that the dates in the existing Scheduling Order would be adjourned until 14 days after the conclusion of the mediation.  The first mediation

---

[3]   Excluded from the Class are Defendants, all officers and/or directors of Bradley during the Class Period, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

session took place on June 13, 2007 before the Honorable Nicholas H. Politan (Ret.), United States District Judge for the District Of New Jersey, but concluded without sufficient movement by the parties to continue the discussions. Plaintiffs continued to prepare their case. The parties thereafter decided to attempt mediation once more and a second mediation session took place on January 17, 2008 before the Honorable Daniel Weinstein (Ret.), Judge for the Superior Court of California.

56.    On May 29, 2007, in the interim between the two mediation sessions, Bradley announced it had reached a proposal from a group of investors, led by Daniel Glassman, to acquire Bradley. However, on October 29, 2007, Bradley announced an agreement to merge with Nycomed U.S., Inc., the effect of which on further settlement discussions and their tenor was unclear.

57.    For each mediation session, the parties exchanged confidential mediation statements. While progress was made during the second mediation session, the parties left without resolution, but with a proposal by the mediator with which to work. With the urging and assistance of Judge Weinstein, the parties continued to negotiate the terms of a potential settlement over the next several months and ultimately reached the Settlement set forth in the Stipulation. An agreement in principle was reached. After agreeing on the basic terms of the Settlement, the parties entered into a Memorandum of Understanding (the "MOU") dated June 3, 2008.

58.    Because Plaintiffs had not yet deposed the Defendants, resolution was conditioned on the deposition testimony of Daniel Glassman and Bradley Glassman which were thereafter conducted. The depositions confirmed the challenges Plaintiffs faced in the continued litigation of the matter with respect to the Individual Defendants' scienter.

## THE PROPOSED SETTLEMENT

59.    After several months of negotiating the Stipulation of Settlement and the related documents, on December 19, 2008, Lead Plaintiffs and Defendants entered into a proposed Settlement that, if approved by the Court, will resolve the claims against all Defendants and provide a monetary recovery to the Class in the amount of $3,500,000 plus interest (collectively, the "Settlement Amount").

60.    On December 30, 2008, Lead Counsel submitted Plaintiffs' motion for preliminary approval of the Settlement and the Notice to the Court. Thereafter, Lead Counsel worked with Berdon in connection with the preparation of the Notice, Plan of Allocation, Summary Notice and Proof of Claim and Release form, overall Claims administration, and responding to inquiries from Class members concerning the Settlement and Proofs of Claim.

**The Settlement is in the Best Interests of the Class and Warrants This Court's Approval**

61.    The reaction of the Class overwhelmingly supports the Settlement and Plan of Allocation. As stated above, Class members had until May 20, 2009 to request exclusion from, or object to, any aspect of the Settlement and not a single objection or request for exclusion has been received.

62.    This Settlement represents 15% of the approximately $22.9 million in recoverable damages for the Class, as conservatively estimated by Plaintiffs' counsel's damage consultant. The Settlement is all cash and will be distributed promptly after the completion of the claims process, as opposed to the delay that would occur if the case were to proceed to trial.  Even if Lead Plaintiffs were successful at trial, the possibility exists that any recovery could be further delayed in the event of an appeal by Defendants.

63.    Accepting the Settlement would also avoid substantial risks of continuing this

litigation. For the reasons mentioned herein and in our accompanying brief, Lead Plaintiffs recognize that, on summary judgment, or at trial, they faced real challenges to loss causation and scienter which could result in the Class obtaining no recovery (*see JDS Uniphase Wins Shareholder Lawsuit* regarding jury verdict for defendants in trial of *In re JDS Uniphase Securities Litigation*, No. C-02-1486 (CW) (N.D. Cal. 2002), attached hereto as Exhibit A.), and that there was no certainty that the Class would be certified. It is also possible that a jury could award significantly less damages than sought by the Class, leaving the Class with a diminished recovery and/or at a far later time than the Settlement provides.

64. Plaintiffs' counsel are actively engaged and experienced in complex federal and state litigation, particularly the litigation of securities class actions and this experience provided the ability to identify the factual and legal issues and challenges presented by this case. *See* Exhibit B (Abbey Spanier's firm resume); *see also* Certification of Gary S. Graifman In Support of Application for Attorneys' Fees Filed on Behalf of Kantrowitz, Goldhamer and Graifman ("Graifman Cert."), Affidavit of Aaron Brody on Behalf of Stull, Stull & Brody in Support of Motion for Approval of Attorneys' Fees and Reimbursement of Expenses ("Brody Aff."), Declaration of Joseph J. DePalma in Support of Application of Lite DePalma Greenberg & Rivas, LLC for an Award of Attorneys' Fees and Reimbursement of Expenses ("DePalma Decl."), and Declaration of Joel B. Strauss Filed on Behalf of Kaplan Fox & Kilsheimer LLP in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Strauss Decl.").

65. Lead Plaintiffs agreed to this Settlement after consultation with their counsel, having been provided with a full understanding of the risks of the litigation and of the Settlement benefits.

66.   While firmly believing that the claims asserted against Defendants have merit, Lead Plaintiffs and their counsel concluded that the Settlement is fair, reasonable, and adequate and in the best interests of the Class.  In coming to this conclusion, Lead Plaintiffs and their Counsel considered, among other things, the substantial and immediate benefits that members of the Class will receive from the Settlement, the risks associated with proving each element of their claims, the fact that they could lose at trial or that a jury award could be substantially less than the recovery sought, and the risks associated with an appeal by Defendants even if Lead Plaintiffs were successful at trial.

## THE PLAN OF ALLOCATION

67.   The proposed Plan of Allocation reflects Lead Plaintiffs' allegations that the Class Period trading prices of Bradley common stock were higher than they would have been had Defendants not materially misrepresented the financial condition of Bradley, and that disclosure of the truth resulted in an immediate decline in Bradley's stock price.

68.   The proposed Plan of Allocation was the result of the factual and legal analysis performed by Plaintiffs' counsel with respect to loss causation and damages after discussions with Plaintiffs' damage consultant, and conversations with the claims administrator.[4]

69.   The Claims Administrator will determine, for each Class member that submits a timely and valid Proof of Claim ("Authorized Claimant"), the *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Loss." The Recognized Loss formula is not intended to represent what a Class Member might have been able to recover after a trial, nor is it an estimate of the amount that will be paid to Authorized Claimants

---

[4]   Plaintiffs retained a firm with expertise in materiality, causation and damages in securities actions.  We refer to that firm as our "damages consultant" because the time for designating experts has not yet occurred.

pursuant to the Settlement. The Recognized Loss formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants. The Recognized loss formula takes into account the inflation of Bradley's share price during the Class Period as a result of the allegedly materially misleading statements contained in the Third Quarter Press Release and the Third Quarter Form 10-Q, as well as the effect of the February 28, 2005 announcement of the SEC Inquiry on Bradley's share price.

70.    The Plan of Allocation contained in the Notice is straightforward and fair, stating that no claim will be recognized for shares of Bradley common stock purchased between October 28, 2004 and February 25, 2005 which were not owned as of the close of trading on February 25, 2005. Only Class members who purchased common stock between October 28, 2004 and February 25, 2005 and continued to own these shares as of the close of trading on February 25, 2005 are believed to have been affected by Bradley's disclosure. Class members will receive the lesser of: (i) the difference (if a loss) between their stock purchase price and $9.75; or (ii) $3.28 per share. $3.28 per share represents the drop in Bradley's stock price of $3.50 per share minus $.22 for the effect of the other market forces on that day.

## AWARD TO PLAINTIFFS' COUNSEL

71.    Plaintiffs' counsel prosecuted this action on a wholly contingent basis, and by doing so, they have shouldered the risk of an unfavorable result and have worked without compensation for over four years. The declarations submitted by Plaintiffs' counsel attest to the collective investment of 3781.83 hours of uncompensated attorney and paralegal time, for an aggregate lodestar of $1,969,221.65. $911,482.50 of that amount, representing 1834.25 hours of work, is time expended by Abbey Spanier. Annexed hereto as Exhibit C is a chart showing each attorney and paralegal who worked on this matter at Abbey Spanier, and the time spent, by

category, and his or her current hourly rate, as reflected in the contemporaneous time records of the firm.[5] No time for the preparation of counsel's fee application is included. Similar charts are appended to the declarations of the other Plaintiffs' counsel herein with respect to the time spent by their firms. *See* Graifman Cert. Exhibit A; Brody Aff. Exhibit A; DePalma Decl. Exhibit B; Strauss Decl. Exhibit A.

72.    The amount of hours spent by each attorney and paralegal was multiplied by the current rates of such attorney and paralegal to arrive at Plaintiffs' counsel's lodestar. As Lead Counsel, Abbey Spanier developed the strategy for the prosecution of the case and has participated in or overseen every aspect of this litigation, from working with private investigators to identify confidential witnesses to prepare the Complaint to the drafting of court submissions and all other documents which include the opposition to Defendants' motion to dismiss the Complaint, the document requests and interrogatories served on Defendants, responding to the discovery requests to Lead Plaintiffs, reviewing and analyzing the documents produced by Defendants and third parties, research with respect to the appropriate third parties upon whom subpoenas should be and preparing such subpoenas, preparation of the mediation statements, working with Plaintiffs' consultant with respect to the issues of loss causation and damages, negotiating the Settlement and negotiating the terms of the Settlement papers with Defendants' counsel, and preparing the motion for preliminary approval of the Settlement and the brief in support of the Settlement.

---

[5]    For attorneys and paralegals that are no longer with the firm, the lodestar calculation is based on the hourly rate in his or her final year of employment with Abbey Spanier. The hourly rates of Abbey Spanier and its co-counsel were submitted to the court in *In re: Sovereign Bancorp Inc. Shareholders Litigation*, Case No. 2587 (Pa. Com. Pl. 2008) where lodestar was the basis for the attorneys' fees requested and awarded in the April 17, Final Order and Judgment annexed hereto as Exhibit D.

73.    Plaintiffs' counsel submits that the 30% of the Settlement Fund requested for counsel fees is fair and reasonable.  The fee request, on the percentage fee award basis, is within the range of fees customarily awarded in actions such as this one, as is addressed in the accompanying memorandum of law.  When cross-checked with Plaintiffs' counsel's lodestar amounts, the fee requested is far less than the value of the time Plaintiffs' counsel expended litigating the case.  The requested fee is justified in light of the benefit conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of the legal services performed.  The Notice advised the members of the Class that Plaintiffs' counsel would move the Court to award attorneys' fees in an amount not to exceed 30% Settlement Fund, and no Class member has objected.

74.    Plaintiffs' counsel also seeks reimbursement of expenses reasonably and necessarily incurred in prosecuting this action and routinely charged to clients who are billed by the hour.  Those expenses include, among others, long distance telephone and facsimile, filing fees, computerized research, photocopying, postage and delivery.  The expenses incurred by Plaintiff's Counsel, as reflected in their accompanying declarations are $152,930.11, in the aggregate.  Given that the Notice advised that Plaintiffs' counsel would not seek expenses over $150,000, we seek reimbursement of $150,000.  Annexed hereto as Exhibit E is a chart showing, by category, the $123,121.97 of expenses incurred by Abbey Spanier in the prosecution of this matter, as reflected in the regularly kept books and records of the firm.  Similar charts are appended to the declarations of the other Plaintiffs' counsel herein with respect to the expenses incurred by their firms.

## AWARD TO LEAD PLAINTIFFS

75.    Lead Plaintiffs further request that the Court grant their request for reimbursement

to Lead Plaintiffs CTA and Edward T. Greene for their reasonable costs and expenses directly related to their representation of the Class. As described in the accompanying declaration of John Kallianis, Lead Plaintiff CTA, through Mr. Kallianis and CTA's Finance & Investment Officer Steve Kelso, together with other CTA personnel, devoted substantial resources to the oversight of, and participation in, the litigation on behalf of the Class. Therefore, its request for reimbursement of costs and expenses of $10,626 is fair and reasonable and merits the Court's approval.

76.    As described in Mr. Greene's accompanying declaration, he too devoted his time to the oversight of, and participation in, the litigation on behalf of the Class for which he seeks reimbursement of $10,000.

77.    The combined CTA and Greene requests total $20,626. The Notice advised Class members that Lead Plaintiffs would apply for reasonable costs and expenses directly relating to the representation of the Class in an amount not to exceed $40,000, to which no Class member has objected. Rosenbaum Aff. ¶10.

78.    Annexed hereto as Exhibit F is a true and correct copy of the Court's order in *P. Schoenfeld Asset Management LLC v. Cendant Corp.*, Civ. No. 98-4734 (WHW) awarding $35,000 for reimbursement of costs and expenses to the Lead Plaintiff (together with the declaration of the *P. Schoenfeld* Lead Plaintiff), to which reference is made in the accompanying memorandum of law.

## CONCLUSION

For the reasons set forth above and in the accompanying memorandum of law, Lead Plaintiffs respectfully submit that: the Class meets the requirements of Rule 23 and should be certified for purposes of the Settlement; that the Settlement and the Plan of Allocation are fair,

reasonable and adequate and should be approved; that the application for an award of attorneys' fees and reimbursement of expenses is also fair and reasonable, and should be granted; and that the application by Lead Plaintiffs' for reimbursement of their reasonable costs and expenses is likewise fair.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jill S. Abrams

Sworn to before me this 12th
day of June 2009.

_____
Notary Public

Judith L. Spanier
Notary Public, State of New York
No. 02SP5034453
Qualified in Westchester County
Commission Expires 12 / 19 / 20 10