ABBEY SPANIER RODD & ABRAMS, LLP
Jill S. Abrams (pro hac vice)
Orin Kurtz (pro hac vice)
212 East 39th Street
New York, New York 10016
Tel: 212-889-3700
Fax: 212-684-5191

Plaintiffs' Lead Counsel

KANTROWITZ, GOLDHAMER & GRAIFMAN
Gary Graifman
210 Summit Avenue
Montvale, New Jersey 07645
Tel: 201-391-7000
Fax: 201-307-1086

Liaison Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

***ELECTRONICALLY FILED***

---

|  |  |
|---|---|
| IN RE BRADLEY PHARMACEUTICALS, INC. ) | Civil Action No. 05-CV-1219 |
| SECURITIES LITIGATION ) | (PGS) (ES) |

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF FINAL APPROVAL OF SETTLEMENT, CERTIFICATION OF CLASS FOR
SETTLEMENT PURPOSES, PLAINTIFFS' COUNSEL'S APPLICATION FOR AN
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES AND
LEAD PLAINTIFFS' REQUEST FOR REIMBURSEMENT OF THEIR
REASONABLE COSTS AND EXPENSES**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE PROPOSED SETTLEMENT ................................................................. 2

III.    DUE PROCESS REQUIREMENTS HAVE BEEN SATISFIED ............... 2

IV.     THE STANDARDS FOR JUDICIAL APROVAL OF CLASS ACTION
        SETTLEMENTS ................................................................................................ 4

V.      THE PROPOSED SETTLEMENT SATISFIES THE STANDARDS FOR
        APPROVAL OF CLASS ACTION SETTLEMENTS AND SHOULD BE
        APPROVED ........................................................................................................ 6

   1.   Complexity, Expense and Likely Duration of the Case ................................. 6

   2.   The Reaction of the Class to the Settlement ................................................. 7

   3.   The Stage of Proceedings and the Amount of Discovery Completed ............... 8

   4.   Risks of Establishing Liability at Trial ......................................................... 9

   5.   The Risks of Establishing Damages ............................................................. 10

   6.   The Proposed Settlement is Justified in Light of the Risk of Maintaining a Class Action
        Through Trial ............................................................................................... 11

   7.   The Ability of the Defendants to Withstand a Greater Judgment ................... 11

   8.   The Settlement is Reasonable in Light of the Best Possible Recovery and the Litigation
        Risks ............................................................................................................ 12

VI.     THE PROPOSED SETTLEMENT IS THE RESULT ............................... 13

VII.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ................... 13

VIII.   THE COURT SHOULD CERTIFY THE CLASS ..................................... 14

   1.   The Class is so Numerous That Joinder of all Members is Impracticable ............ 15

   2.   Common Questions of Law And Fact Exist ................................................. 15

   3.   Lead Plaintiffs' Claims are Typical of the Class .......................................... 16

4.  Lead Plaintiffs Will Fairly and Adequately Represent the Class ..................................... 17

5.  The Requirements of Rule 23(b) are Satisfied.................................................................. 18

    a. Common Questions of Law and Fact Predominate Such That a Class Action is Superior to Other Available Methods for Adjudication ................................................................. 18

    b. A Class Action Is Superior To Other Available Methods For The Fair and Efficient Adjudication Of The Controversy. ................................................................................... 19

IX.  **PLAINTIFFS' COUNSEL ARE ENTITLED TO A FEE FROM THE COMMON FUND THEY CREATED**.......................................................................................... 19

    1.  The Size of the Fund Created and the Number of Persons Benefited .............................. 21

    2.  Total Absence of Objections............................................................................................. 21

    3.  Skill and Efficiency of Counsel ....................................................................................... 22

    4.  Complexity and Duration of Litigation and Risk of Non-Payment.................................. 23

    5.  Amount of Time Counsel Devoted to the Case ................................................................ 23

    6.  Awards in Similar Cases................................................................................................... 23

    7.  The Requested Fee is Fair and Reasonable Under the Lodestar Method ......................... 24

X.  **THE COSTS AND EXPENSES OF PLAINTIFFS' COUNSEL SHOULD BE REIMBURSED** ................................................................................................................ 25

XI.  **LEAD PLAINTIFFS' REASONABLY INCURRED COSTS AND EXPENSES SHOULD BE REIMBURSED** ............................................................................................ 26

**CONCLUSION** ............................................................................................................................ 28

# TABLE OF AUTHORITIES

**Cases**  **Pages**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................... 17, 18

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................ 19

*Boeing Co. v. Van Gemert*,
  444 U.S. 472, 478 (1980)................................................................. 20

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981)............................................................................ 5

*Cullen v. Whitman Med. Corp.*,
  197 F.R.D. 136 (E.D. Pa. 2000)........................................................ 24

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)...................................................................... 6, 10

*Eisenberg v. Gagnon*,
  766 F.2d 770 (3d Cir. 1985)............................................................. 19

*Fickinger v. C.I. Planning Corp.*,
  646 F. Supp. 622 (E.D. Pa. 1986) ..................................................... 5

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
  604 F. Supp. 446 (E.D. Pa. 1985) ..................................................... 5

*Fisher Bros., Inc. v. Mueller Brass Co.*,
  630 F. Supp. 493 (E.D. Pa. 1985) ..................................................... 5

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)....................................................... 5, 6, 7, 9

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000)...................................................... 21, 22, 23

*In re Apollo Group, Inc. Securities Litigation*,
  No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008)............. 12

*In re AremisSoft Corp. Sec. Litig.*,
  210 F.R.D. 109 (D.N.J. 2002)......................................................... 4, 20

*In re Burlington Coat Factory*,
   114 F.3d 1410 (3d Cir. 1997)................................................................... 19

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)........................................................... 5, 9, 23

*In re Cendant Corp. Sec. Litig.*,
   109 F. Supp. 2d 235 (D.N.J. 2000) ........................................................... 5

*In re Charter Commc'ns, Inc. Sec. Litig.*,
   MDL Docket No. 1506, Cons. Case No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772,
   at *75 (E.D. Mo. June 30, 2005) ............................................................. 28

*In re Cigna Corp. Sec. Litig.*,
   No. 02-8088, 2007 U.S. Dist. LEXIS 51089, at *11 (E.D. Pa. July 13, 2007).............. 8, 13, 20

*In re Cmty Bank of N. Virginia*,
   418 F.3d 277 (3d Cir. 2005)................................................................... 17

*In re Corel Corp. Inc. Sec. Litig.*,
   293 F. Supp. 2d 484 (E.D. Pa. 2003) .................................................. 23, 24, 27, 28

*In re Electro-Catheter Sec. Litig.*,
   No. CIV. 87-41, 1987 U.S. Dist. LEXIS 13500, (D.N.J. Dec. 3, 1987) ...................... 16

*In re FleetBoston Fin. Corp. Sec. Litig.*,
   Civ. No. 02-4561, 2005 U.S. Dist. LEXIS 36431,(D.N.J. Dec. 22, 2005) .............................. 15

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"),
   55 F.3d 768 (3d Cir. 1995)..................................................................... 4

*In re Immune Response Sec. Litig.*,
   497 F. Supp. 2d 1166 (S.D. Cal. 2007).......................................................... 26

*In re JDS Uniphase Securities Litigation*,
   No. C-02-1486 (CW) (N.D. Cal. 2002) ........................................................... 12

*In re Lloyd's Am. Trust Fund Litig.*,
   No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) .. 11

*In re Lucent Techs., Inc. Sec. Litig.*,
   307 F. Supp. 2d 633 (D.N.J. 2004) .......................................................... 5, 13, 15

*In re Pet Food Prods. Liab. Litig.*,
   MDL Docket No. 1850, C.A. No. 07-2867 (NLH), 2008 U.S. Dist. LEXIS 94603, at *97
   (D.N.J. Nov. 18, 2008)....................................................................... 4, 20

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)......................................................................... 9, 15, 18, 20, 21, 24

*In re Rent-Way Sec. Litig.*,
   305 F. Supp. 2d 491 (W.D. Pa. 2003)........................................................................ 2, 4, 21, 25

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005)........................................................................................ 20

*In re Safety Components Int'l, Inc. Sec. Litig.*,
   166 F. Supp. 2d 72 (D.N.J. 2001) ............................................................. 7, 21, 22, 23, 24, 25

*In re Saxon Sec. Litig.*,
   No. 82 Civ. 3103 (MJL), 1985 U.S. Dist. LEXIS 14305, at *43 (S.D.N.Y. Oct. 31, 1985) .... 12

*In re TTI Secs. Litig.*,
   Civil Action No. 04-CV 4305(PGS)(Document 107)................................................ 24

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)........................................................................................ 4, 12

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)........................................................................ 26, 27

*Kanter v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ........................................................................................... 16

*Keenan v. City of Philadelphia*,
   983 F.2d 459 (3d Cir. 1992)........................................................................................ 24

*Lan v. Ludrof*,
   No. 1:06cv114-SJM, 2008 U.S. Dist. LEXIS 22574, at *44 (W.D. Pa. Mar. 21, 2008) .......... 12

*Lerch v. Citizens First Bancorp, Inc.*,
   144 F.R.D. 247 (D.N.J. 1992)..................................................................................... 15

*McPhail v. First Command Fin'l Planning*,
   No. 05 cv 179-IEG-JMA, 2009 U.S. Dist. LEXIS 26544, at *14-15
   (S.D. Cal. Mar. 30, 2009)............................................................................................ 12

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)..................................................................................................... 25

*Neuberger v. Shapiro*,
   110 F. Supp. 2d 373 (E.D. Pa. 2000) ........................................................................ 21, 24, 25

*Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001).................................................................................. 16

*Oh v. AT&T Corp.*,
   225 F.R.D. 142 (D.N.J. 2004)......................................................................... 23, 25, 26

*P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp.*,
   No. 98-4734 (WHW) ......................................................................................... 27

*Safran v. United Steelworkers of Am.*,
   132 F.R.D. 397 (W.D. Pa. 1989)....................................................................... 18

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000)............................................................................. 10

*Varacallo v. Mass. Mutual Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005)........................................................................... 23

*Walsh v. Great Atl. & Pac. Tea Co., Inc.*,
   96 F.R.D. 632 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983) ............................ 5

*Wetzel v. Liberty Mutual Ins. Co.*,
   508 F.2d 239 (3d Cir. 1975).............................................................................. 17

*Yang v. Odom*,
   No. 02-5968 (JAP), 2005 U.S. Dist. LEXIS 18089, at *20 (D.N.J. Aug. 16, 2005)................... 16

*Zinberg v. Wash. Bancorp, Inc.*,
   138 F.R.D. 397 (D.N.J. 1990)................................................................... 15, 16, 19

**Statutes**

15 U.S.C. § 78u-4(a)(4) .................................................................................... 26

15 U.S.C. § 78u-4(a)(6) .................................................................................... 20

15 U.S.C. § 78u-4(b)(4) .................................................................................... 10

**Rules**

Fed. R. Civ. P. 23 ................................................................................... passim

## I.    INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Chicago Transit Authority Retirement Fund ("CTA"), Edward T. Greene ("Greene"), American Welding Co. and Gonzalo M. Podesta (collectively, "Lead Plaintiffs") respectfully submit this memorandum of law in support of their application for final approval of the proposed Settlement ("Settlement"), and Plan of Allocation as set forth in the Stipulation and Agreement of Settlement (the "Stipulation"), as being fair, reasonable and adequate.  Lead Plaintiffs also submit this memorandum in support of the reasonableness of Plaintiffs' counsel's application for an award of attorneys' fees and reimbursement of expenses, and the reimbursement of reasonable costs and expenses for Lead Plaintiffs CTA and Edward T. Greene.

Through their vigorous efforts, Lead Plaintiffs have achieved the Settlement on behalf of a Class of all persons or entities who purchased or otherwise acquired the common stock of Bradley Pharmaceuticals Inc. ("Bradley") between October 28, 2004 and February 25, 2005, inclusive.[1]  The Class was preliminarily certified for purposes of the Settlement only, by the Court's February 19, 2009 Preliminary Approval Order (the "Preliminary Approval Order") and Plaintiffs seek final approval thereof.

Although some of the facts are repeated in this memorandum where necessary, the Court is respectfully referred to the Declaration of Jill S. Abrams submitted herewith ("Abrams Declaration") for a detailed history of the litigation.  This Settlement was arrived at by

---

[1]    Excluded from the Class are Defendants (namely, Bradley, Daniel Glassman, Bradley Glassman and R. Brent Lenczycki), all officers and/or directors of Bradley during the Class Period, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

well-informed Lead Plaintiffs and Plaintiffs' counsel, only after years of litigation and arms' length settlement negotiations. Although 7,890 notices have been mailed to prospective Class members, not a single Class member has objected to any aspect of the Settlement or the request for counsel fees or reimbursement of costs and expenses by Plaintiff's Counsel or Lead Plaintiffs. *See* accompanying Declaration of Jill S. Abrams submitted herewith ("Abrams Decl."), ¶6. No Class member has sought exclusion from the Class.

## II.    THE PROPOSED SETTLEMENT

On December 19, 2008, Lead Plaintiffs and Defendants entered into a proposed Settlement that, if approved by the Court, will resolve the claims against all Defendants and provide a monetary recovery to the Class in the amount of $3.5 million, plus interest from the time of the Preliminary Hearing Order (collectively, the "Settlement Amount"). The entire Settlement Amount (after deduction of Court-approved costs and fees) will be distributed to Class members who timely submit valid Proofs of Claim ("Net Settlement Fund").

## III.    DUE PROCESS REQUIREMENTS HAVE BEEN SATISFIED

"In order to satisfy due process, notice to class members must be reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 510-11 (W.D. Pa. 2003) (citation and quotation marks omitted).

Pursuant to the Preliminary Approval Order, and as detailed in the accompanying affidavit of Michael Rosenbaum ("Rosenbaum Aff."), Managing Director of Berdon Claims Administration LLC ("Berdon" or the "Claims Administrator"), the Claims Administrator has mailed the Notice of Pendency of Class Action Settlement, Motion for Attorneys' Fees and Expenses, and Lead Plaintiffs' Costs and Expenses and Settlement Fairness Hearing (the

"Notice") and Proof of Claim and Release forms, by first class mail, to Class members who were identified in Bradley's transfer records; brokers, banks and other nominees on the Depository Trust Company's Participant Proxy Contact List; other nominees identified from databases that Berdon created and maintained, who may have purchased Bradley common stock for the beneficial interest of individual investors and financial institutions identified by Vickers Directory of Institutional Investors as having directly purchased Bradley common stock during the Class Period, as well as Class members who were identified as appropriate additional recipients by initial Notice recipients. Rosenbaum Aff. ¶¶3, 5-6.

Pursuant to the Preliminary Approval Order, the Summary Notice of Settlement (the "Summary Notice") was published in the March 16, 2009 edition of *Investor's Business Daily*. Rosenbaum Aff. ¶9. Berdon has also maintained a toll-free "800" telephone number to field calls from Class members, and has posted the Notice and Proof of Claim form on its website for direct access by Class members. Rosenbaum Aff. ¶4.

On April 20, 2009, at the request of Plaintiffs' Counsel and with the Court's permission, Berdon mailed an errata postcard (the "Supplemental Notice") to correct a typographical error in the Notice and to advise Class members that the location of the June 19, 2009, Settlement Fairness Hearing had changed due to the relocation of the Court from Newark to Trenton. Berdon mailed copies of the Supplemental Notice to all persons to whom it mailed the Notice. Rosenbaum Aff. ¶8.

The Notice, Summary Notice and Supplemental Notice provided Class members with notice of whose rights would be affected by the Settlement, the value of the Settlement and how to object or exclude oneself from the Settlement and the May 20, 2009 date for doing so. Abrams Decl. ¶12. The Notice gave a detailed description of the litigation, the claims being

released, the reasons for the Settlement and an explanation of the Plan of Allocation, and was thus sufficient under the requirements of the PSLRA. *In re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. 109, 120 (D.N.J. 2002); *Rent-Way*, 305 F. Supp. 2d at 511.

The Notice and Summary Notice advised Class members of the application for an award of attorneys' fees and reimbursement of expenses and the application for an award to Lead Plaintiffs CTA and Greene for reimbursement of their reasonable costs and expenses. Abrams Decl.¶10. Plaintiffs' Counsel respectfully submits that the notice program effectuated per the Preliminary Approval Order easily meets the due process requirements of Rule 23 of the Federal Rules of Civil Procedure.

No Class member has objected to the Settlement, the request for counsel fees and expenses, or Lead Plaintiffs' cost and expense reimbursement or sought exclusion from the Class. Rosenbaum Aff.¶10. Thus, it is clear that the members of the Class share the view that the Settlement is a good one.

## IV.    THE STANDARDS FOR JUDICIAL APROVAL OF CLASS ACTION SETTLEMENTS

"Overall, settlement of litigation is favored by the courts and particularly so in class action litigation." *In re Pet Food Prods. Liab. Litig.*, MDL Docket No. 1850, C.A. No. 07-2867 (NLH), 2008 U.S. Dist. LEXIS 94603, at *97 (D.N.J. Nov. 18, 2008) (citing *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 535 (3d Cir. 2004).

Rule 23(e) provides that "a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." *See also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"), 55 F.3d 768, 778 n.1 (3d Cir. 1995). The district court acts "as a 'fiduciary guarding the rights of absent class members' by ensuring that the proposed settlement is fair, reasonable, and adequate." *Rent-Way*, 305 F. Supp. 2d at 499

(quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001)). While the court enjoys considerable discretion in determining whether a proposed settlement satisfies this standard, *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 642 (D.N.J. 2004) (citation omitted), it should not substitute its judgment for that of the parties who negotiated the settlement. *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985).

"Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981); *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 96 F.R.D. 632, 642-43 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983). The Court may rely on the judgment of experienced counsel and should avoid transforming the hearing on the settlement into a trial on the merits. *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000).

In determining the adequacy of a proposed settlement, the Court should ascertain whether the settlement is within a range that responsible and experienced attorneys could accept, considering all relevant risks. *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 630 (E.D. Pa. 1986); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985).

In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Third Circuit directed the district courts to consider the following factors (called "*Girsh* Factors") in deciding whether to approve a proposed settlement of a class action under Rule 23(e):

> (1) the complexity, expense and likely duration of the litigation…; (2) the reaction of the class to the settlement…; (3) the stage of the proceedings and the amount of discovery completed…; (4) the risks of establishing liability…; (5) the risks of establishing damages…; (6) the risks of maintaining the class action through the trial…; (7) the ability of defendants to withstand a greater judgment…; (8) the range of reasonableness of the settlement fund in light of the best possible

recovery…; and (9) the range of reasonableness of the settlement fund to a possible

recovery in light of all the attendant risks of litigation.

*Id.; see also GM Trucks*, 55 F.3d at 782.

## V.    THE PROPOSED SETTLEMENT SATISFIES THE STANDARDS FOR APPROVAL OF CLASS ACTION SETTLEMENTS AND SHOULD BE APPROVED

### 1.    Complexity, Expense and Likely Duration of the Case

"The first *Girsh* factor requires [the Court] to consider the probable cost, in both time and

money, of continued litigation so as to determine the degree to which the Class would benefit

from settling the class claims amicably."   *Rent-Way*, 305 F. Supp. 2d at 499 (citations and

quotation marks omitted).

Here, Lead Plaintiffs faced issues that would have greatly impacted the cost, in both time

and money, of the litigation.   First, in their motion to dismiss, Defendants argued that Lead

Plaintiffs failed to properly allege loss causation under *Dura Pharmaceuticals, Inc. v. Broudo*,

544 U.S. 336 (2005) because the SEC investigation was not the type of corrective disclosure

*Dura* required.   Abrams Decl. ¶31.

In December 2004, Bradley was notified that the SEC was conducting an informal

inquiry into whether it had violated the federal securities laws and sought information about,

*inter alia*, revenue recognition. Abrams Decl.¶22. On January 12, 2005, the Company announced

lowered guidance for 2005 estimates of sales and earnings which focused on market erosion of

Anamantle, one of its top selling products.   Plaintiffs averred that Defendants omitted mention of

the SEC investigation at that time in order to guide the market down, and did not reveal the SEC

investigation until late February when it received a second SEC letter.   Bradley's stock price

dropped 26.4% on unusually high trading volume in response.   On April 27, 2005, Bradley

informed the market that its 2004 third quarter financial statements would be restated because they had included a $1 million sale of Deconamine syrup that Plaintiffs contended was a sham. Plaintiffs alleged that the booking of the sale of this largely dormant product was made by Bradley without an expectation that the product would be kept by the customer. *Id.* at ¶20.

Although Judge Hochberg rejected Defendants' loss causation argument at the pleading stage, Lead Plaintiffs could not be certain that this Court would reject Defendants' loss causation theory at the summary judgment stage, or that a jury would do so at trial. Abrams Decl. ¶48. Defendants also consistently challenged Lead Plaintiffs' ability to prove scienter, and Lead Plaintiffs' analysis of its ability to prove scienter uncovered considerable risks, such that its disposition at summary judgment or trial were in question.

If the litigation continued, Lead Plaintiffs would have been required to complete deposition discovery and to engage experts to write reports and testify, which would drain financial resources, in order to survive an inevitable summary judgment motion by Defendants regarding loss causation, scienter and damages. After surviving summary judgment, Lead Plaintiffs would then have been required to obtain a favorable verdict at trial and successfully oppose any post-trial appeals. This process which could take years, would be costly, both in terms of time and dollars, and could result in no recovery at all.

Accordingly, the Class will benefit greatly from obtaining an immediate benefit rather than continuing the litigation.

### 2.    The Reaction of the Class to the Settlement

The second *Girsh* factor is "the reaction of the class to the settlement." *Girsh*, 521 F.2d at 157. "It is generally assumed that silence constitutes tacit consent to the agreement." *In re Safety Components Int'l, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 86 (D.N.J. 2001); *GM Trucks*, 55

F.3d at 812 ("Courts have generally assumed that silence constitutes tacit consent to the agreement.")

As recounted above and in the Rosenbaum Affidavit, the Claims Administrator mailed 7,890 copies of the Notice to Class members and published the Summary Notice in *Investor's Business Daily*. The Notice, Summary Notice and Supplemental Notice clearly informed Class members of their right to object to any aspect of the Settlement or to exclude themselves from the settlement, but to date (over three weeks past the May 20 deadline for objecting to the Settlement) no Class member has done so. The Class's favorable reaction is strong evidence that the Settlement is fair, reasonable and adequate and should be approved. *See In re Cigna Corp. Sec. Litig.*, No. 02-8088, 2007 U.S. Dist. LEXIS 51089, at *11 (E.D. Pa. July 13, 2007) ("The class has been exceptionally supportive in that no objections to the settlement were filed.").

### 3. The Stage of Proceedings and the Amount of Discovery Completed

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *GM Trucks*, 55 F.3d at 813. The Settlement was reached only after Plaintiffs' counsel engaged in careful and extensive research, investigation and analysis of the facts and circumstances, including review of over 190,000 pages of documents produced by Defendants and served subpoenas on, and obtained and reviewed thousands of pages of documents from Bradley's outside auditor, Grant Thornton, LLP; Quality King, the counterparty to the Deconamine Transaction; Eisner, LLP, Bradley's internal controls consultant; as well as several analysts that followed Bradley and two Bradley customers. Abrams Decl. ¶¶33-44. As the mediation process proceeded, Lead Plaintiffs and their counsel were well aware of the challenges they faced on the scienter, loss causation and

damage aspects of their case. The Settlement was conditioned on the testimony of defendants Daniel Glassman and Bradley Glassman who were deposed following execution of a memorandum of understanding that set forth the basic terms of the Settlement. *Id*. ¶58. That testimony essentially confirmed what Plaintiffs had gleaned from the documents obtained from Defendants, Grant Thornton, Quality King and Eisner.    Based on this analysis, together with the assistance of their consultant on materiality, loss causation and damages (*Id*. ¶68),[2] Plaintiffs' counsel are confident that they have an ample basis on which to assess the strengths and weaknesses of the claims, and propose the Settlement to the Court for approval.

### 4.    Risks of Establishing Liability at Trial

The fourth factor for consideration under the *Girsh* analysis is "the risks of establishing liability." *Girsh,* 521 F.2d at 157. This factor is considered in order to "examine what the potential rewards (or downsides) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *In re Cendant Corp. Litig.,* 264 F.3d 201, 237 (3d Cir. 2001). The inquiry requires a balancing of the likelihood of success if "the case were taken to trial against the benefits of an immediate settlement." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 319 (3d Cir. 1998).

As stated above, and in the Abrams Declaration at ¶¶45-48, substantial risks stood in the way of establishing liability, with respect to establishing loss causation and scienter, which are necessary elements of a securities fraud claim. In addition, a class has not yet been certified and, although Lead Plaintiffs believe that the Class would have been certified, there existed the risk that the Class could go unrepresented based on Defendants' challenges to the proposed class

---

[2]    Plaintiffs retained a firm with expertise in materiality, causation and damages in securities actions and refer to that firm as our "damages consultant" because the time for designating experts has not yet occurred. *Id*. ¶68, n.4.

representatives.

Such risks strongly weigh in favor of the Settlement.

### 5.    The Risks of Establishing Damages

The dispute concerning loss causation would necessarily spill over into damages.

Defendants have maintained from the beginning of this Action that the February 28, 2005

announcement of the SEC inquiry was not a "corrective disclosure" under *Dura*.  Abrams Decl.

¶48.  Without loss causation, of course, there could be no damages.  Although Plaintiffs' counsel

could make what we believe are strong arguments to counter this assertion, there is no guarantee

that such arguments would be successful at trial, where

Lead Plaintiffs would bear the burden of proving damages.  *See Dura*, 544 U.S. at 345-46

(PSLRA "expressly imposes on plaintiffs 'the burden of proving' that the defendant's

misrepresentations 'caused the loss for which the plaintiff seeks to recover.'") (quoting 15

U.S.C. § 78u-4(b)(4)).

The determination of damages is a complicated and uncertain process, involving the

analysis of many subjective factors.  Damages in a securities fraud action are measured by "the

difference between the purchase price and the 'true value' of the security [*i.e.*, value absent the

fraud] at the time of the purchase."  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir.

2000).  Plaintiffs must also show that the alleged false and misleading statements caused the

damages which, as noted above, Defendants steadfastly disputed.

Because of the complex nature of damages and loss causation in a securities fraud action,

expert testimony is almost always necessary to establish the amount—and indeed the existence—

of damages.  Expert testimony in this case likely would have resulted in sharply contrasting

conclusions.  The experts would likely have disagreed as to whether the February 28, 2005

announcement of the SEC inquiry was a "corrective disclosure" when, as Defendants contend, it did not mention the Deconamine Transaction; whether other market factors caused the February 28, 2005 drop in Bradley's stock price; and whether another part of the February 28, 2005 announcement—the mention of an investigation into capitalization of certain costs—separately caused a drop in the share price that was not attributable to the announcement of the investigation regarding the Deconamine Transaction.  In addition, Defendants would contend that there was no damage on revelation of the restatement because there was no drop in Bradley's common stock price on April 27, 2005.

A jury verdict with respect to damages would thus depend on the jury's reaction to this technical testimony, a reaction that is uncertain at best.  *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002). Plaintiffs' Counsel recognize the very real possibility that a jury could be swayed by experts for Defendants.  Accordingly, this factor weighs heavily in favor or settlement.

### 6.    The Proposed Settlement is Justified in Light of the Risk of Maintaining a Class Action Through Trial

The Class has been certified for settlement purposes only. There is no guarantee that, absent the Settlement, the Class would have been certified given the risks stated above or, once certified, would have remained so. *See* Fed. R. Civ. P. 23(c)(1)(C) (an order certifying a class "may be altered or amended before final judgment").

### 7.    The Ability of the Defendants to Withstand a Greater Judgment

Bradley was acquired by Nycomed, U.S., Inc. on February 28, 2008, and, while Plaintiffs believe that Nycomed likely could have withstood a greater judgment, assuming it was Nycomed's obligation to do so, it is also unclear whether the Individual Defendants could have shouldered such a judgment. Many settlements have been approved where a settling defendant

11

has had the ability to pay greater amounts, and the Third Circuit has noted that this fact alone does not weigh against settlement approval. *Warfarin*, 391 F.3d at 538; *Lan v. Ludrof*, No. 1:06cv114-SJM, 2008 U.S. Dist. LEXIS 22574, at *44 (W.D. Pa. Mar. 21, 2008) ("[T]his factor does not weigh in favor of settlement, but it is ultimately outweighed by other factors that do.").

### 8.    The Settlement is Reasonable in Light of the Best Possible Recovery and the Litigation Risks

The Settlement is clearly within the range of reasonableness. The Settlement here represents over 15% of the maximum potential recovery under a conservative damages estimate by Lead Plaintiffs' damages consultant (Abrams Decl. ¶62) "and is unquestionably better than another 'possibility' – little or no recovery at all." *In re Saxon Sec. Litig.*, No. 82 Civ. 3103 (MJL), 1985 U.S. Dist. LEXIS 14305, at *43 (S.D.N.Y. Oct. 31, 1985). A recovery of 15% is above the average 11.7% on settlements under $50 million in the year 2008. *McPhail v. First Command Fin'l Planning*, No. 05 cv 179-IEG-JMA, 2009 U.S. Dist. LEXIS 26544, at *14-15 (S.D. Cal. Mar. 30, 2009) ("For securities class action settlements below $ 50 million, median settlements as a percentage of estimated damages were 10.5% through year end 2005 and 8.8% in 2006.")(citations and quotation marks omitted).

The risks in this case were substantial in comparison to the immediate recovery to be received by the Class in the Settlement. In the year before the parties agreed to the Settlement, two securities class actions went to trial in which plaintiffs were unsuccessful. In *In re JDS Uniphase Securities Litigation*, No. C-02-1486 (CW) (N.D. Cal. 2002), the jury returned a verdict for the defendants. Abrams Decl. Ex. A. On August 4, 2008, in *In re Apollo Group, Inc. Securities Litigation*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), the court overturned a $277.5 million jury verdict for the plaintiffs. The *Apollo* court granted the defendants judgment as a matter of law on the grounds that the plaintiffs had not

produced the necessary evidence to demonstrate a corrective disclosure and deemed the jury's finding of loss causation to be incorrect. *Id.* at *21-22. These cases resulted in total losses for the plaintiffs after years of litigation. Plaintiffs here faced similar risks given the difficulty in proving the elements of securities fraud and defending any potential verdict through years of appeals.

## VI.   THE PROPOSED SETTLEMENT IS THE RESULT OF ARM'S LENGTH NEGOTIATIONS

The proposed settlement is the product of settlement negotiations that occurred over the course of one year and involved direct negotiations between the parties, mediation sessions with two former judges with extensive mediation experience, and a mediator's assistance following the second formal mediation session. Abrams Decl. ¶¶55-57. Accordingly, there can be no doubt that the proposed settlement is the result of arm's length negotiations. *Cigna*, 2007 U.S. Dist. LEXIS 51089, at *12 ("it is clear that negotiations for the settlement occurred at arm's length, as the parties were assisted by a retired federal district judge who was privately retained and served as a mediator").

## VII.   THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

"Approval of a Plan of Allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate." *Lucent Techs.,* 307 F. Supp. 2d at 649 (citation omitted).

The Settlement contains a proposed Plan of Allocation which established the method by which the Settlement Fund will be distributed to Class members who submitted valid Proofs of Claim. The Plan was the result of the factual and legal analysis performed by Plaintiffs' counsel with respect to loss causation and damages after discussions with Plaintiffs' damage consultant,

and conversations with the claims administrator. Abrams Decl. ¶68.

In Lead Plaintiffs' view, the Plan of Allocation reflects the allegations that the price of Bradley securities were artificially inflated by reason of the allegedly false and misleading statements made by Defendants during the Class Period, *i.e.* that the price of Bradley stock remained inflated until February 28, 2005 when its common stock price dropped $3.75 per share from its previous trading day on Bradley's corrective disclosure.  In order to have recoverable damages (a "Recognized Claim"), a class member must have purchased Bradley stock during the Class Period and owned that stock on February 25, 2005.  Abrams Decl. ¶70.  Each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Fund based on her, or his, Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. Rosenbaum Aff. Ex. A at 7, ¶43.

Eligible Class Members who do not submit valid Proofs of Claim will not share in the Settlement.  An eligible Class member who does not submit a request for exclusion or submit an acceptable Proof of Claim will nevertheless be bound by the Settlement and the Order and Final Judgment of the Court dismissing this Action.  Rosenbaum Aff. Ex. A at 7, ¶40.

No Class Member has objected to the Plan of Allocation.  Abrams Decl. ¶12; Rosenbaum Aff. ¶12.  The favorable reaction of the Class supports approval of the proposed Plan of Allocation which is a fair, reasonable and adequate method for allocating the Settlement proceeds among the various members of the Class.

## VIII.   THE COURT SHOULD CERTIFY THE CLASS
##          FOR PURPOSES OF THE SETTLEMENT

As part of this application for an Order approving the Settlement, Plaintiffs' Counsel requests that this Court certify this action as a class action, pursuant to Fed. R. Civ. P. 23.

"Class actions created for the purpose of settlement are well recognized under Rule 23 of the Federal Rules of Civil Procedure." *Lucent Techs.,* 307 F. Supp. 2d at 639-40 (citation omitted). "[A] district court must . . . find a class satisfies the requirements of Rule 23, regardless whether it certifies the class for trial or for settlement." *Prudential*, 148 F.3d at 308. As noted by the Court in the Preliminary Approval Order, the Class here satisfies all of the prerequisites set forth in Fed. R. Civ. P. 23(a) and (b)(3).

### 1.      The Class is so Numerous That Joinder of all Members is Impracticable

For class action treatment to be appropriate, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *In re FleetBoston Fin. Corp. Sec. Litig.*, No. 02-4561, 2005 U.S. Dist. LEXIS 36431, at *2 (D.N.J. Dec. 22, 2005) (Bassler, J.). "Impracticability does not mean 'impossibility', but… [only] the difficulty or inconvenience of joining all members of the class." *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 250 (D.N.J. 1992) (quoting *Zinberg v. Wash. Bancorp, Inc.,* 138 F.R.D. 397, 406 (D.N.J. 1990).

During the Class Period, there were millions of shares of Bradley common stock traded on the New York Stock Exchange ("NYSE"), which is an efficient and developed securities market. Comp. ¶¶ 14, 64, 74-77. Notice has been provided to 7,890 Class members, some of whom hold Bradley shares in "street name" on behalf of many other members. Rosenbaum Aff ¶6. Thus, it is fair to infer that the proposed class is sufficiently numerous to warrant class treatment.

### 2.      Common Questions of Law and Fact Exist

In order to maintain a class action, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Rule 23(a) does not require that all questions of law or fact be common to each member of the Class. *Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.,*

259 F.3d 154, 183 (3d Cir. 2001).

The common legal and factual issues in this action include:

a.      whether the federal securities laws were violated by Defendants' acts;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Bradley; and

c.      to what extent the members of the Class have sustained damages, and the proper measure of damages.

Comp. ¶72.

Lead Plaintiffs have therefore set forth sufficient facts to show that this action satisfies Rule 23's commonality requirement.

### 3.      Lead Plaintiffs' Claims are Typical of the Class

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class."  The focus of the typicality inquiry in a securities class action is the defendants' behavior.  The crucial question is whether the named plaintiff and the class can "point to the same broad course of alleged fraudulent conduct to support a claim for relief."  *Zinberg,* 138 F.R.D. at 401 (quoting *In re Electro-Catheter Sec. Litig.*, No. 87-41, 1987 U.S. Dist. LEXIS 13500, at *8 (D.N.J. Dec. 3, 1987)); *Yang v. Odom*, No. 02-5968 (JAP), 2005 U.S. Dist. LEXIS 18089, at *20 (D.N.J. Aug. 16, 2005).

Lead Plaintiffs purchased Bradley common stock at prices they claim were artificially inflated by Defendants' false and misleading statements.  Comp. ¶¶ 13, 44-52, 53-63, 64-67, 71. Lead Plaintiffs' claims are representative of, and are not "markedly different" from, those of the Class it seeks to represent and typicality is thereby established.  *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994).  The purchases of Bradley securities were based on uniform, public statements, made in Company press releases and SEC filings that contained

material misrepresentations concerning sales and returns of AnaMantle and the Deconamine Transaction.

### 4. Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement has been viewed as encompassing two inquiries designed to protect the interests of absentee class members: first, it considers whether the named plaintiffs' interests are sufficiently aligned with and not antagonistic to the absent Class members; and second whether proposed class counsel are sufficiently qualified to represent the class. *In re Cmty Bank of N. Virginia*, 418 F.3d 277, 303 (3d Cir. 2005); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). The adequacy inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).

Lead Plaintiffs satisfy both prongs of the "adequacy" test. First, Lead Plaintiffs' interests are not antagonistic to those of the Class. Moreover, the respective claims of Lead Plaintiffs and the Class arise from the exact same wrongful conduct, involve the exact same legal theories, and require the same proof. Comp. ¶¶ 13, 44-52, 53-63, 64-67, 71. Lead Plaintiffs have demonstrated, through their actions, their willingness to press forward throughout the litigation.

The second prong of the adequacy test is satisfied by the representation of the Class by experienced counsel. Plaintiffs' counsel are highly experienced in class litigation and have successfully prosecuted numerous securities class actions in courts throughout the United States and in this Circuit, as shown by their firm resumes. Abrams Decl. Ex. B; Certification of Gary S. Graifman ("Graifman Cert."), Exhibit C; Affidavit of Aaron Brody ("Brody Aff."), Exhibit C; Declaration of Joseph J. DePalma ("DePalma Decl."), Exhibit A; and Declaration of Joel B.

17

Strauss ("Strauss Decl."), Exhibit C.

Plaintiffs' counsel have diligently and aggressively represented the Class in all respects.

**5.    The Requirements of Rule 23(b) are Satisfied**

In addition to meeting the requirements of Rule 23(a), this action satisfies the requirements of Rule 23(b).  Rule 23(b)(3) requires that a proposed class representative establish that common questions of law or fact predominate over individual questions, and that a class action is superior to other available methods of adjudication.  As a result, the only individual questions relate to individual Class members' damages.

**a.    Common Questions of Law and Fact Predominate Such That a Class Action is Superior to Other Available Methods for Adjudication**

A class is united by a common interest in determining whether a defendant's course of conduct is actionable.  This element is not defeated by slight differences in class members' positions.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 510-11 (D.N.J. 1997); *Prudential*, 148 F.3d at 314-15.  As noted by the U.S. Supreme Court, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  *Amchem*, 521 U.S. at 625.

Rule 23(b) (3) requires that common issues of law and fact predominate over individual issues.  Courts look to the "common nucleus of operative facts" to determine predominance of common questions.  *Safran v. United Steelworkers of Am.,* 132 F.R.D. 397, 401 (W.D. Pa. 1989).  This case turns upon allegations of a common course of conduct on the part of Defendants that injured the Class.  The common issues of law and fact that flow from that alleged wrongful conduct are at the heart of this case and plainly predominate.

Lead Plaintiffs allege a fraud on the market with respect to Bradley's common stock, a claim that is ideally suited to class action treatment. The fraud-on-the-market theory, upon which

Plaintiffs rely to establish the element of reliance has been expressly endorsed by the Supreme Court (*Basic Inc. v. Levinson*, 485 U.S. 224, 227 (1988)), and is a predominant issue in this case which permits class action treatment. Courts in the Third Circuit routinely recognize that the fraud-on-the-market theory provides a predominant common issue in class actions alleging fraudulent misrepresentation or omissions that affected securities prices on a developed, open market. This is because "in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 n.8 (3d Cir. 1997).

### b.    A Class Action Is Superior To Other Available Methods For The Fair and Efficient Adjudication Of The Controversy.

Rule 23(b)(3) also requires that a class action be "superior to other available methods for the fairly and efficiently adjudicating the controversy." That is clearly the case here because, as with other securities fraud actions, this action involves a large number of Class members with relatively small individual claims. The class mechanism is the best way of resolving all class members' claims and sparing the judicial system the expense and burden of dealing with even a handful of duplicative lawsuits. *Zinberg*, 138 F.R.D. at 402. The Third Circuit has explicitly stated that "class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws, since the effectiveness of the securities laws may depend in large measure on the application of the class action device." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985). Accordingly, the Court should certify the Class here.

## IX.    PLAINTIFFS' COUNSEL ARE ENTITLED TO A FEE FROM THE COMMON FUND THEY CREATED

Plaintiffs' counsel prosecuted this action on a wholly contingent basis, and by doing so,

they have shouldered the risk of an unfavorable result and have worked without compensation for over four years.  Abrams Decl. ¶71.  If the Settlement is approved, Plaintiffs' counsel will have conferred a substantial and immediate benefit on the Class. Accordingly, Plaintiffs' counsel seeks reasonable compensation for the common fund they created.

"It has long been recognized that an attorney who prosecutes an action on a contingent fee basis that results in the creation of a fund or benefit for his or her clients may obtain fees from that common fund." *Pet Food*, 2008 U.S. Dist. LEXIS 94603, at *99 (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)); *see also AremisSoft,* 210 F.R.D. at 128 ("Attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services offered to the settlement fund under the common fund doctrine.").

The PSLRA expressly permits the Court to award attorneys' fees that are "a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6).

"There are two basic methods for calculating attorneys' fees - the percentage-of-recovery method and the lodestar method." *Prudential*, 148 F.3d at 333.  "For many years both the Supreme Court and Third Circuit have favored calculating attorneys' fees as a percentage of the class recovery." *Cigna*, 2007 U.S. Dist. LEXIS 51089, at *13-14 (citations omitted).  "The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (quoting *Prudential*, 148 F.3d at 333).  "In addition to the percentage-of-recovery approach, [the Third Circuit has] suggested it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method." *Id.*

The Third Circuit has identified seven factors that should be considered in deciding whether a fee petition should be approved:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) awards made in similar cases.

*Rent-Way*, 305 F. Supp. 2d at 513 (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

Plaintiffs' counsel respectfully submit that each of these factors weigh heavily in support of granting their application for 30% of the Settlement.

## 1. The Size of the Fund Created and the Number of Persons Benefited

Plaintiffs' Counsel have created a settlement fund of $3.5 million, plus interest. In general, as the size of the settlement fund increases, the percentage award decreases. *Safety Components*, 166 F. Supp. 2d at 95. The Circuit has explained that the "basis for this inverse relationship is the belief that 'in any instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* (quoting *Prudential*, 148 F.3d at 339) (brackets omitted). The size of the settlement fund here is not so large that it warrants an automatic reduction in the percentage award. *Id.* (declining to reduce requested attorneys' fees based on $4.5 million settlement fund); *Neuberger v. Shapiro*, 110 F. Supp. 2d 373 (E.D. Pa. 2000) (same).

## 2. Total Absence of Objections

The second *Gunter* factor is "the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel." *Gunter,* 223 F.3d at 195 n.1.

The Notice mailed to the Class specifically indicated that Plaintiffs' Counsel would apply for a fee award of 30% of the Settlement Fund, and that any Class member could object to the fee application.  Rosenbaum Aff. Exh. A at 2; *Id.* at 6, ¶38.  The deadline for filing an objection was May 20, 2009 and no Class member has objected to Plaintiffs' Counsel's request for an award of attorneys' fees or reimbursement of expenses.  *See* Abrams Decl. ¶12; Rosenbaum Aff. ¶10.  Thus, "[t]he reaction of the Class confirms the reasonableness of the requested fee." *AremisSoft,* 210 F.R.D. at 131.

### 3.    Skill and Efficiency of Counsel

The purpose of a fee award is "to ensure 'that competent counsel continue to undertake risky, complex and novel litigation.'"  *Safety Components,* 166 F. Supp. 2d at 96 (quoting *Gunter*, 223 F.3d at 198). The subject litigation began in 2005 and, as discussed below and in the Abrams Declaration, was vigorously litigated from its inception with the very real threat of a summary judgment motion and a strong opposition

at trial.

Plaintiffs' counsel practice primarily in the complex field of shareholder securities litigation and they have brought their considerable experience to this action. That experience is described in the declarations they have submitted herewith.  *See See* Abrams Decl. Ex. B; Graifman Cert. Ex. C; Brody Aff. Ex. C; DePalma Decl. Ex. A; Strauss Decl. Ex. C.

The fact that this settlement was obtained in the face of formidable opposition by a large firm and highly regarded opposing counsel evidences the quality of the work.  *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003).[3]

---

[3]    "Discussing this factor in *Cendant*, the Circuit observed that the PSLRA confers on lead plaintiffs in securities class actions the ability to select lead counsel.  [*In re Cendant*, 264 F.3d 201 at 284.] As such, the Circuit determined that courts should employ a deferential standard of

### 4.    Complexity and Duration of Litigation and Risk of Non-Payment

The *Gunter* court stated that "[t]he complexity and duration of the litigation is the first factor a district court can and should consider in awarding fees." *Gunter*, 223 F.3d at 197. "It is axiomatic that if the litigation were short and sweet a proportionally large fee award would be a windfall to Class Counsel." *Varacallo v. Mass. Mutual Life Ins. Co.*, 226 F.R.D. 207, 253 (D.N.J. 2005). There is no dispute that the instant case was not "short and sweet." Suffice it to say that liability (particularly loss causation and scienter), damages were issues that required the type of creative lawyering skills which were applied here. The risk of non-payment, and potential for loss of costs and expenses advanced by Plaintiffs' counsel, were substantial.

### 5.    Amount of Time Counsel Devoted to the Case

Plaintiffs' Counsel spent 3781.83 hours litigating this case,[4] which represents a "substantial commitment to this litigation." *Corel*, 293 F. Supp. 2d at 496-97; *Safety Components*, 166 F. Supp. 2d at 102 (counsel spent 1507.85 hours); Abrams Decl. ¶71.

### 6.    Awards in Similar Cases

Courts in the Third Circuit award fees in the range of 19% to 45%, putting the instant request for 30% just below the midpoint. *Oh v. AT&T Corp.*, 225 F.R.D. 142, 152 (D.N.J. 2004).

The awards in cases with settlements of similar size are comparable to the attorneys' fees requested in this case. For instance, in *In re TTI Secs. Litig.*, Civil Action No. 04-CV-4305(PGS)(Document 107), a securities class action, this Court awarded 30% of the gross

---

review in assessing … the skill and efficiency of the attorneys[] because the PSLRA assumes that properly-selected lead plaintiffs are at least as able to answer those questions as courts." *Safety Components*, 166 F. Supp. 2d at 96 (internal quotations omitted).

[4]    This figure does not include time spent by Plaintiffs' Counsel in preparing the fee request herein. Abrams Decl. ¶71.

settlement amount to the plaintiff's counsel in an action that settled for $4.5 million. Similarly, in *Safety Components*, 166 F. Supp. 2d 72, a securities class action that settled for $4.5 million, the court awarded plaintiffs' counsel 33.3% of the settlement fund. *Id.* at 109. In *Neuberger*, 110 F. Supp. 2d 373, the court awarded the attorneys a 30% fee for a settlement of $4.5 million. *Id.* at 386. In many cases with settlements below $10 million, courts have awarded similar attorneys' fees to those requested here. *Corel*, 293 F. Supp. 2d 484 (33.3% of $7 million settlement); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000) (33% of $7.3 million settlement fund). Based on these awards, Plaintiffs' Counsel's fee request is reasonable.

7. **The Requested Fee is Fair and Reasonable Under the Lodestar Method**

Lead Plaintiffs respectfully submit that the requested fee is also fair and reasonable when cross-checked under the lodestar / multiplier approach.

The Third Circuit has recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Prudential*, 148 F.3d at 341; *Corel*, 293 F. Supp. 2d at 497 ("multiples between lodestars and fee requests tend to range between 1 and 4"). As set forth in their respective submissions, Plaintiffs' counsel, combined, expended 3781.83 hours on the prosecution of this action. The number of hours spent by each attorney and paralegal was multiplied by the current rates of such attorneys and paralegals to arrive at Plaintiffs' counsel's lodestar, the combined total of which is $1,969,221.65.[5] Abrams Decl. Ex. C; Graifman Cert. Ex. A; Brody Aff. Ex.A; DePalma Decl.

---

[5]    Plaintiffs' Counsels' lodestar is calculated at current rates. The Supreme Court has held that use of current rates is proper since such rates compensate for inflation and loss of the use of funds. *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *see also Safety Components*, 166 F. Supp. 2d at 103 n.11 (noting that the Third Circuit has held that "'the lodestar ought to be adjusted to account for the incurred costs of the delay plaintiffs' counsel has undergone in receiving payment.'") (quoting *Keenan v. City of Philadelphia*, 983 F.2d 459, 476 (3d Cir.

Ex. B; Strauss Decl. Ex. A. The requested fee is significantly less than the value of the time Plaintiffs' counsel expended litigating the case. Abrams Decl. ¶73.[6] The fee requested represents a negative multiplier and thus far less than the fees awarded in similar cases. S*ee Oh*, 225 F.R.D. at 154 (2.15 lodestar multiplier); *Safety Components*, 166 F. Supp. 2d at 103 (multiplier of 2.81); *Corel*, 293 F. Supp. 2d at 497 (in granting fee request with 1.03 multiple, court noted that "the multiple in this case is at the lower end, a factor which militates in favor of approval.").[7]

## X.    THE COSTS AND EXPENSES OF PLAINTIFFS' COUNSEL SHOULD BE REIMBURSED

"[T]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of … reasonable litigation expenses from that fund." *Lan*, 2008 U.S. Dist. LEXIS 22574, at *49-50 (quoting *Rent-Way*, 305 F. Supp. 2d at 519). Plaintiffs' counsel seek reimbursement of expenses totaling $152,930.11. These expenses are based on the declarations of Plaintiff's counsel, each of which has submitted an expense report itemizing categories of expenses and the amount thereof. *See* Abrams Decl. Ex. D; Graifman Cert. Ex. B; Brody Aff. Ex. B; DePalma Decl. Ex. C; Strauss Decl. Ex. B. They are the types of expenses deemed by courts to be reasonably incurred in the prosecution of a class action. *Oh*, 225 F.R.D. at 154 ("Several courts have held that photocopying expenses, telephone and facsimile charges, and postal, messenger, and express mail service charges are reasonably incurred in connection

---

1992)); *Rent-Way*, 305 F. Supp. 2d at 518 n.10 ("Counsels' fees were appropriately calculated based on current, rather than historic, hourly rates.").

[6]     "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07.

[7]     In *Neuberger*, 110 F. Supp. 2d 373, the court did not perform the lodestar cross check.

with the prosecution of a large litigation."). Given that the Notice informed Class members that Plaintiffs' counsel would apply for up to $150,000 in expenses (to which no Class member objected), Plaintiffs' counsel seeks reimbursement of $150,000. Abrams Decl. ¶74; Rosenbaum Aff. ¶10. The expenses were reasonable and necessarily incurred and warrant the Court's approval.

## XI. LEAD PLAINTIFFS' REASONABLY INCURRED COSTS AND EXPENSES SHOULD BE REIMBURSED

Pursuant to 15 U.S.C. §78u-4(a)(4), Lead Plaintiff CTA seeks an award of $10,626 and Lead Plaintiff Edward Greene seeks an award of $10,000, as reimbursement for their time and expenses devoted to their efforts in this case, as set forth in the declarations of John Kallianis and Edward T. Greene submitted herewith.

"The PSLRA permits the court to order an award to lead plaintiffs for the services they rendered in a securities class action." *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (citing 15 U.S.C. § 78u-4(a)(4)). The *Xcel* court also said:

> In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery.

> *Id.* (citation omitted).

Courts in this Circuit and elsewhere have reimbursed plaintiffs for time they or their employees spent in assisting the prosecution of securities class actions. *See, e.g., In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173-74 (S.D. Cal. 2007) (reimbursing plaintiff $40,000 in lost wages); *Xcel Energy*, 364 R. Supp. 2d at 1000 (awarding $100,000 to lead plaintiff group who "communicated with counsel throughout the litigation, reviewed counsels'

submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations"); *P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp.*, No. 98-4734 (WHW) (attached as Exhibit E to the Abrams Decl.) (awarding lead plaintiff $35,000 in reimbursement of costs and expenses);[8] *Corel*, 293 F. Supp. 2d at 498 (awarding $10,325 to three plaintiffs where through "the course of th[e] litigation, the lead plaintiffs each responded to the defendant's written discovery requests and were deposed").

Mr. Kallianis is the Executive Director of CTA, as set forth in the accompanying Declaration of John V. Kallianis on Behalf of Lead Plaintiff Retirement Plan for Chicago Transit Authority ("Kallianis Decl.") ¶1. He brought his considerable sophistication to bear to assist the Class in its efforts in this case. Mr. Kallianis had regular discussions with Plaintiffs' counsel about the case which included case strategy and review of and input into the pleadings, participated in the search for and production of documents together with other CTA personnel, traveled to New York City from Chicago for his deposition and had numerous discussions with Plaintiffs' counsel concerning settlement negotiations. Kallianis Decl. ¶¶2-7. Steven Kelso, Finance & Investment Officer of the CTA, also provided substantial assistance to Plaintiffs' Counsel in the gathering of documents, with Mr. Kallianis and Mr. Kelso having devoted approximately 55 hours and 15 hours, respectively to the litigation. Kallianis Decl. ¶8. The Kallianis Declaration describes the time spent by him, Mr. Kelso and his predecessor and their general counsel (who were assisted by others), and shows that the Class was clearly benefited by CTA's participation as a Lead Plaintiff. *Id.* ¶8.

---

[8]    In *P. Schoenfeld*, the lead plaintiff's declaration requested $35,000 for "time [spent by the lead plaintiff's CEO and employees] and expenses in helping to pursue this case on behalf of the [c]lass." Declaration of Peter Schoenfeld, Abrams Decl. Exh. E. Of this amount, approximately $1,650 was attributable to out of pocket costs. *Id.* at ¶5. Judge Walls awarded the lead plaintiff $35,000. Order dated August 1, 2006, Abrams Decl. Exh. E at ¶2.

While Mr. Kallianis and Mr. Kelso were working for the benefit of the Class, they were unable to provide services to the CTA. Kallianis Decl. ¶8. Accordingly, reimbursement of the CTA for "time and services rendered for the benefit of the Class is consistent with . . . the PSLRA." *In re Charter Commc'ns, Inc. Sec. Litig.*, MDL Docket No. 1506, Cons. Case No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772, at *75 (E.D. Mo. June 30, 2005). Based on the time CTA personnel spent on this case and the value thereof, they seek reimbursement in the amount of $10,000 plus reimbursement of $626 in travel expenses, for a total of $10,626. *Id*. ¶8-9.

Similarly, Mr. Greene brought significant experience with him as president of a small industrial company. (Greene Decl. ¶1.) Like CTA, he took time away from running his company to participate in many aspects of this action including strategy, settlement and discovery through discussion with counsel, searches for relevant documents and travel from Rhode Island where his company is located to New York to meet with his counsel and appear for a deposition. (*Id.*. ¶¶5-8). In total, Mr. Greene estimated that he spent 60 hours in connection with the litigation of this action, and believes that $10,000 is reasonable reimbursement for his efforts. *Id*. ¶8.

The Notice advised that Lead Plaintiffs would seek up to $40,000 in reimbursement, to which there was no objection. The Lead Plaintiffs' combined request for $20,626 is far less than that sum and is reasonable given their efforts.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (a) approve the Settlement as fair, reasonable, and adequate; (b) approve the Plan of Allocation; (c) certify the Class for settlement purposes, (d) award attorneys' fees of 30% of the Settlement to

Plaintiffs' Counsel for their efforts in creating the Settlement on behalf of the Class, and (e) reimburse Plaintiffs' Counsel and Lead Plaintiffs CTA and Edward T. Greene for their reasonable costs and expenses incurred in connection with this litigation.

Dated:  June 12, 2009

Respectfully submitted,

KANTROWITZ, GOLDHAMER
 & GRAIFMAN


By:__s/ Gary S. Graifman_____
Gary S. Graifman
210 Summit Avenue
Montvale, New Jersey 07645
Tel: 201-391-7000
Fax: 201-307-1086

Plaintiffs' Liaison Counsel

ABBEY SPANIER RODD
 & ABRAMS, LLP

Jill S. Abrams (*admitted pro hac vice*)
Orin Kurtz (*admitted pro hac vice*)
212 East 39th Street
New York, New York 10016
Tel: 212-889-3700
Fax: 212-684-5191

Plaintiffs' Lead Counsel

STULL, STULL & BRODY
Jules Brody
Mark Levine
Aaron Brody
6 East 45th Street
New York, New York 10017
Tel: 212-687-7230
Fax: 212-490-2022

Counsel for Plaintiffs the American Welding Co.,
Edward T. Greene and Gonzalo M. Podesta